# EXHIBIT

# A

COMMONWEALTH VS.

| RECORD CON. NO. | NAME, A/K/A, ADDRESS, ZIP CODE | | | YEAR, TERM & NO. |
|---|---|---|---|---|
| POLICE PHOTO NO. **579974** | **FRANKLIN LEE** **01517 N. HOLLYWOOD ST** **PHILA. PA 19100** | OTN#M2007180 | THIS CASE INVOLVES NOS. | 84103945 334 |

| STATUS OF DEFENDANT | | PLACE OF PRELIM. HEARING **RM 675 CITY HALL** | ISSUING AUTH. **LIPSCHUTZ** 256 |
|---|---|---|---|

| Bail Set $ **10000** | Bail Made $ | DT. OF INCIDENT **8/20/84** | BIRTH DATE **6/14/60** | SEX **M** | RACE **N 1** | D.C. NO. **842350687** |
|---|---|---|---|---|---|---|

| Surety Name & Address | | ATTY. CD. **76325C** | M. C. CASE NO. **84/09-1170 1/1** | COMPLAINT DT. **9/14/84** | DT. PREL. HEARING **10/25/84** |
|---|---|---|---|---|---|

| DISM. | BILL NO. | DATE **10/29/84** | DATE OF ARRAIGN. **11/08/84** | POL. SURG. |
|---|---|---|---|---|

CHARGE CODES & CHARGES
**94750-PERJURY 4902 F3**

| PRE-TRIAL/ TRIAL | WANER/JURY | *Non-trial disposition* |
|---|---|---|
| DATE *14 January 1985* | ROOM *480 City Hall* | COURT STENO *Charles Halter* | COURT CLERK *Elaine Simmons* |
| JUDGE *William Porter* | *David Abrahamsen* | COUNSEL *Stanley Stern* |

PLEA

*I, Franklin Lee_____ plead guilty to Perjury F-3. Plea accepted*

*Sentence — Not less than three and one-half years (3½) nor more than seven (7) years in the State Correctional Facility to run concurrent with sentence now being served.*

*By the Court,*

| VERDICT | DATE |
|---|---|
| | |

*Judge*

| SENTENCE | | | |
|---|---|---|---|
| DATE | ROOM | COURT STENO | COURT CLERK |
| JUDGE | ADA | COUNSEL | |

003260

COMMONWEALTH OF PENNSYLVANIA     In the Common Pleas Court of the County of Philadelphia
COUNTY OF PHILADELPHIA      ss.      CRIMINAL SECTION

## THE DISTRICT ATTORNEY OF PHILADELPHIA COUNTY BY THIS INFORMATION CHARGES—

**FIRST COUNT —THAT ON OR ABOUT**      MAY 30 , 1984
**IN PHILADELPHIA COUNTY,**
                                       FRANKLIN LEE
**IN AN OFFICIAL PROCEEDING, UNDER OATH OR EQUIVALENT
AFFIRMATION, FELONIOUSLY DID MAKE A FALSE STATEMENT, OR SWEAR
OR AFFIRM THE TRUTH OF A STATEMENT PREVIOUSLY MADE, WHEN THE
STATEMENT WAS MATERIAL AND THE DEFENDANT DID NOT BELIEVE IT TO
BE TRUE.**

**OFFICIAL PROCEEDING —** PRELIMINARY HEARING ON MAY 30, 1984

**OATH OR EQUIVALENT AFFIRMATION —** OATH SWORN TO BEFORE JUDGE KAFRISS

**FALSE STATEMENT —** DEFENDANT STATED WILLIE STOKES TOLD HIM HE
KILLED LESLIE CAMPBELL.

**MATERIALITY —** WILLIE STOKES WAS CONVICTED OF MURDER.

**BELIEF OF DEFENDANT —** DEFENDANT KNEW WILLIE STOKES HAD NOT MADE
SUCH A STATEMENT.

18 PA. S. 4902

All of which is against the Act of Assembly and the peace and dignity of the Commonwealth of Pennsylvania.

10/29/84      DISTRICT ATTORNEY      ASSISTANT DISTRICT ATTORNEY
              EDWARD G. RENDELL      JOSEPH F. DOUGHERTY

30-91A (Rev. 5/81)

#22

BC-300B (PART I)
(Rev. 2-80)

#22

Type or Print Legibly

**COURT COMMITMENT**
**STATE OR COUNTY CORRECTIONAL INSTITUTION**
Commonwealth of Pennsylvania
vs.

**COMMONWEALTH OF PENNSYLVANIA**
**BUREAU OF CORRECTION**
**BOX 598, CAMP HILL, PA. 17011**

NOTE: Additional supply of this form available at above address:

☐ BC-300B (Part II) attached

_LEE, FRANKLIN_
COMMITMENT NAME  (LAST, FIRST, INITIAL, SUFFIX)

| SEX | DATE OF BIRTH | SID | OTN | COURT OF INITIAL JURISDICTION | COMMON PLEAS |
|---|---|---|---|---|---|
| ☐ F ☒ M | 6-14-60 | | M2007180 | ☐ | ☒ |

| COMMITTING COUNTY/MAGISTERIAL DISTRICT | COURT NUMBER | DATE / TERM |
|---|---|---|
| Philadelphia | 3345 | 84-OCT |

The above defendant after ☒ pleading guilty   ☐ nolo contendere   ☐ being found guilty   was on

_14 JAN_, 19_85_ sentenced by Judge/District Justice _William Porter_ to a term of

not less than _3½_ (years) ____months ____days nor more than _7_ (years)____months____days, or,

____ for the offense of _PERJURY_

(Section____ of the Crimes Code) or (other statute)____

It is further ordered that the said defendant be delivered by the proper authority to and treated as the law

directs at the____ _SCI_ ____facility located at____ _GRATERFORD_

| FINE | COSTS | RESTITUTION |
|---|---|---|
| AMOUNT  $____ | AMOUNT  $____ | |
| To Be Paid To: | To Be Paid By: | |
| ☐ COUNTY  ☐ COMMONWEALTH | ☐ COUNTY  ☐ DEFENDANT | |

CREDIT FOR TIME SERVED (EXPLANATION OF CREDIT COMPUTATION ON REVERSE SIDE) | EFFECTIVE DATE OF SENTENCE
_14 JAN 1985_

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below:

PROSECUTING ATTORNEY
_David Abrahamsen_

DEFENSE ATTORNEY
_Stanley Stern_

COURT REPORTER
_Charles Halter_

DISPOSITION OF NON-INCARCERATION OFFENSE(S)

(THIS BLOCK NOT TO BE USED FOR INCARCERATION OFFENSE)

(SEAL)

In witness, whereof I have hereunto set my hand and seal of said

court, this _14_ day of _January_ 19_85_

_Elaine W. Simmons_
AUTHORIZED SIGNATURE

# PRISONERS' BRING—UP

DATE

TO

☐ SUPERINTENDENT, PHILADELPHIA PRISON
☐ SUPERINTENDENT, HOUSE OF CORRECTION
☐ (Other)

SEND THE FOLLOWING PRISONERS TO

☐ 1801 VINE STREET, ROOM _____
☐ MISDEMEANANTS COURT, 2133 ARCH STREET
☐ COURT ROOM _____ , CITY HALL

Court Clerk

6-24 (Rev. 9/61)

In the Court of Common Pleas of Philadelphia

☐ Trial Division—Criminal Section. Ind. No. _____ Term _____ 19

☐ Philadelphia Municipal Court M.C. No. 8409-1170

Philadelphia, _____ Oct. 25, 1984

Commit and retain _____ Franklin Lee

Charge: Perjury, Held for Court

Bail: $10,000

Attorney present, disto. H 6-8-84 1PC 615
Subject to order of Court.

☐ To the Keeper of the Philadelphia County Prison.

☐ To the Keeper of the House of Correction.

_____ Pro Clerk

6-37 (Rev. 2-69)

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
☐ Trial Division
☐ Criminal Section
☐ Family Court Division
☐ Domestic Rel.
☐ Juvenile
☐ Women's Criminal
☐ Misdemeanant's

IN THE PHILADELPHIA MUNICIPAL COURT
☒ Criminal Section

**Commonwealth**

vs.

Date: _____

**I hereby certify,** That on _____ day of _____ A.D. 19__

_____
Court Clerk

6-25 (Rev. 12/69)

CRIMINAL TRANSCRIPT
PHILADELPHIA MUNICIPAL COURT

| | COMMONWEALTH VS. | | | | | TERM | | NUMBER |
|---|---|---|---|---|---|---|---|---|
| | LEE, FRANKLIN | | OTN. M2007180 MC | | YR. 84 | MO. 09 | | 1170 |
| | 01517 N.HOLLYWOOD ST | | COMPLAINT FILED BY (Name & Ident. or Address) | | | | | DATE |
| | PHILA    PA | | ADA JOHN DI DONATO 1300 CHESTNUT ST | | | | | 08/29/84 |

CHARGE(S) 4902    PERJURY F3

ARRESTED ON 09/13/84   BY (Name & Ident.) GERRARD 5   9189   COMMENTS M2007180

| NEXT ACTION | DATE 09/19/84 | TIME 0900 | LOCATION CITY HALL — COURT ROOM 675 | | POLICE PHOTO NO. 0579974 |
|---|---|---|---|---|---|

**ARRAIGNMENT**

BAIL SET AT $ 10,000   DISPOSITION

A.D.A. HARRIS (CLERK)   SIGNATURE OF JUDGE   ARRAIGN. DATE 09/14/84   TIME 0352

ATTORNEY FOR DEFENDANT PVT   NAME OF JUDGE MARGIOTTI   COURT CLERK GRUNSBY

## PRELIMINARY HEARING OR TRIAL CONTINUANCES

| FIRST ACTION | CONTINUED TO | REASON FOR CONTINUANCE | CODE | | JUDGE |
|---|---|---|---|---|---|
| 9-19-84-675 | 9-27-84-675 | Counsel appointed | ☐ B.W. Issued ☐ B.O.S.O. | | Macoll |
| FURTHER ACTION Stanley Stern | CONTINUED TO Esq. | REASON FOR CONTINUANCE Comm. Rdway | CODE | ☐ B.W. Issued ☐ B.O.S.O. | JUDGE |
| FURTHER ACTION 9/27/84 | CONTINUED TO 10/18/84 675 | REASON FOR CONTINUANCE Def. atty. Stern observing Jewish Holiday old and appointed Nearly | CODE | ☐ B.W. Issued ☐ B.O.S.O. | JUDGE |
| FURTHER ACTION 10-18-84-675 | CONTINUED TO 10-25-84-625 | REASON FOR CONTINUANCE Atty not prepared not appointed M.B.T. defense | CODE | ☐ B.W. Issued ☐ B.O.S.O. | JUDGE |

## PRELIMINARY HEARING DISPOSITION

| DATE 10-25-84 | PLACE R.675 | ATTORNEY FOR DEFENDANT (Name & Address) Stanley Stern |
|---|---|---|
| COURT CLERK Foster/Williams | COURT REPORTER Tom Kennedy | ATTY. NO. | ADA Robert Marano |

After (waiving) hearing, above defendant is held for Court as follows:

(Amount of Bail) Same   (Charge) Perjury   ARRAIGNMENT DATE & ROOM 11-8-84 875

$10,000.00   By the Court.   12 noon

Hon. Mitchell S. Lipschutz

It is ordered that the charge(s) against the defendant are to be presented to the District Attorney for the preparation of an information.   DATE   JUDGE

## TRIAL DISPOSITION DATA

| DATE | PLACE | ATTORNEY FOR DEFENDANT | | | ATTY NO. |
|---|---|---|---|---|---|
| COURT CLERK | COURT REPORTER | PLEA | VERDICT | ATTY. FOR PROSECUTION | |

SENTENCE

*I hereby certify that the above is a true and correct return and transcript. Witness my hand and Official Seal.*   JUDGE   DATE   (Seal)

30-369 (REV. 5/81)   CLERK OF QUARTER SESSIONS

COMMONWEALTH OF PENNSYLVANIA
PHILADELPHIA COUNTY

FELONY P/H
MISDEMEANOR TL
DIVERSION CASE

CRIMINAL COMPLAINT
COMMONWEALTH OF PENNSYLVANIA
COMMONWEALTH OF PENNSYLVANIA VS. FRANKLIN LEE

M.C.#: 84-09-1170          D.C.#:   80-23-50687

I, the undersigned, do hereby state under oath or affirmation:

(1) My name is: ROBERT J. MARANO, Assistant District Attorney.

(2) I accuse FRANKLIN LEE, who lives at 1517 N. Hollywood St., Phila., Pa., with violating the penal laws of Pennsylvania.

(3) The day and date when the accused committed the offense was on or about: Monday, August 20, 1984.

(4) The offense was committed in the County of Philadelphia.

(5) The acts committed by the accused were:  on May 30, 1984, the defendant was sworn and testified before the Honorable Arthur Kaffrissen in courtroom 675 City Hall and testified that he was told by Willie Stokes that he (Willie Stokes) shot and killed Leslie Campbell.  On 8/20/84 the defendant was again sworn in front of Judge Malmed in courtroom 654, City Hall, Phila., Pa. and stated that he lied on 5/20/84 in courtroom 675, City Hall, in violation of Pa. Penal Laws, Section(s) and Title(s):  4902 Perjury P3, all of which is against the peace and dignity of the Commonwealth.

(6) I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the charges I have made.

(7) I swear to or affirm the within complaint upon my knowledge, information and belief, and sign it on _8/21/84_ before Philadelphia Municipal Court Judge _____

_____
Signature of Affiant

On August 29, 1984,  the above named affiant swore or affirmed that the facts set forth in the complaint were true and correct to the best of his/her knowledge, information and belief, and signed it in my presence.  I believe the within affiant to be a responsible person and that there is probable cause for the issuance of process.

_____   SEAL.
Issuing Authority

WAIVER: On _____, 19___, I appeared before Judge _____ who read the above complaint to me and explained its contents, and I hereby waived preliminary hearing and consent to be bound over to Court.

# WARRANT OF ARREST

**no. 129859**

COMMONWEALTH OF PENNSYLVANIA } ss.
COUNTY OF PHILADELPHIA

To _Det. Ernest Gilbert_ , or any other authorized
(Serving Officer)

person, in the name of the Commonwealth of Pennsylvania, you are commanded to take into custody

_Franklin Lee_ , _1517 Hollywood St_
(Name)                                              (Address)

if _he_ be found in the said Commonwealth, and bring _him_ before us at
(he, they)                                              (him, them)

_Twentieth Court_ to answer the Commonwealth upon the complaint or
(Address)

citation of _Det. Gilbert_ charging _him_ with
(him, them)

_Perjury_

, and further to be dealt with

according to law, and for such purposes this shall be your sufficient warrant. Witness the hand

and official seal of _Francis P. Callan_ , this date _8/29_ 19 _84_ .
(Judge)

_Callan_
(Judge)

(SEAL)

Bail to be demanded: $ _____

C.C. No. _____

30-155 (Rev. 8/76)

# SUBPOENA

**THE CITY AND COUNTY OF PHILADELPHIA**
**THE COMMONWEALTH OF PENNSYLVANIA**

| TERM | NUMBER |
|------|--------|
|      |        |

☑ DEFENDANT *(Name)*
☐ WITNESS

Is commanded by Order of the Court, to appear as a
☑ Defendant, ☐ Witness, in case captioned above at
the precise time and place indicated. This subpoena
shall be continuing and shall remain in force until the
termination of the above criminal proceeding.

I hereby acknowledge receipt of this notice.

_____
*Signature of Defendant or Witness*

**➡ BRING THIS SUBPOENA WITH YOU ⬅**

SIGNATURE OF COURT CLERK

FOR:

COMMONWEALTH *(et al)*
Vs.

☑ DEFENDANT
☐ WITNESS

RE ORDERED TO APPEAR AT
PHILADELPHIA

☑ MUNICIPAL COURT
☐ COURT OF COMMON PLEAS

AT

| MONTH | DAY | YEAR | TIME | A.M.<br>P.M. |
|-------|-----|------|------|------|

_____
*President Judge*
COURT OF COMMON PLEAS

_____
*President Judge*
MUNICIPAL COURT

_____
THE CLERK OF QUARTER SESSIONS

FILE COPY

6-296 (Rev. 3/80)

| 1 | DATE | TYPE | COURTROOM | COURT STENO. | 2 | DATE 11-8-84 | TYPE HLP | COURTROOM 875 | COURT STENO. |
|---|------|------|-----------|--------------|---|------|------|-----------|--------------|
| | COURT CLERK | JUDGE | ADA | COUNSEL | | COURT CLERK | JUDGE | ADA | COUNSEL |
| | CONTIN. CODE | CONT. TO JUDGE | CONT. TO ROOM | ON (Date) | | CONTIN. CODE | CONT. TO JUDGE Porter | CONT. TO ROOM 480 FT | ON (Date) 11-21-84 |
| | DEFENSE ☐ Ready ☐ Not Ready | | PROSECUTION ☐ Ready ☐ Not Ready | | | DEFENSE ☐ Ready ☐ Not Ready | | PROSECUTION ☐ Ready ☐ Not Ready | |

*Major*

~~RULE 1100~~ 2/25/85

Graterford Y 3924

| 3 | DATE 11-21-84 | TYPE | COURTROOM 480 | COURT STENO. Haller | 4 | DATE | TYPE | COURTROOM | COURT STENO. |
|---|------|------|-----------|--------------|---|------|------|-----------|--------------|
| | COURT CLERK Adleson | JUDGE Porter | ADA Shakeme | COUNSEL S. Stein | | COURT CLERK | JUDGE | ADA | COUNSEL |
| | CONTIN. CODE | CONT. TO JUDGE | CONT. TO ROOM 480 | ON (Date) 1-14-85 | | CONTIN. CODE | CONT. TO JUDGE | CONT. TO ROOM | ON (Date) |
| | DEFENSE ☐ Ready ☐ Not Ready | | PROSECUTION ☐ Ready ☐ Not Ready | | | DEFENSE ☐ Ready ☐ Not Ready | | PROSECUTION ☐ Ready ☐ Not Ready | |

*Informal Discovery complete.*
*Case continued for status.*

*By the Court*

Graterford # Y 3924

| COMMONWEALTH VS. | | RULE 1100 EXPIRATION DATE | | INFORMATION NO. |
|---|---|---|---|---|
| RECORD CONTROL NO. | NAME, A/K/A, ADDRESS, ZIP CODE | | | YEAR, TERM & NO. |
| POLICE PHOTO NO. | Franklin Lee | | | THIS CASE INVOLVES NOS. TO |

6-288  (Rev. 8/76)

# EXHIBIT

# B

Affidavit

Commonwealth of Pennsylvania    )

                                )  S.S.

County of Dauphin               )

I FRANKLIN LEE   (        ) of HARRISBURG Pennsylvania, Make Oath And say that:

1) I herein state that the following information, statements, and facts concerning my false statements against Willie Stokes in 1984 are true, correct and complete to the best of my knowledge.

2) See following enclosed attached document (Letter) from me referenced exhibit ' A' attachment.

Subscribed And Sworn To

Before Me, on the  2 nd

Day of JANUARY , 2020   2AR

_Tiffany A. Kuhn_
Notary Public

My Commission expires: 07/17/2022

_Franklin Lee_

FRANKLIN LEE

Commonwealth of Pennsylvania - Notary Seal
Tiffany A. Kuhn, Notary Public
Dauphin County
My Commission Expires July 17, 2022
Commission Number 1335675

I FRANKLIN Lee, BEING DULY SWORN HERE IN
DEPOSES AND SAY:
I LIED MADE FALSE STATEMENTS AND
Testimony At willie Stokes PRELIMINARY
HEARING ON, MAY 30, 1984 IN COURTROOM
675, City HALL, I LIED Testified fALSELY
That willie Stokes TOLD me" HE KILLED
LESLIE CAMPBELL" HE NEVER MADE THIS
STATEMENT To Me. I WAS CHARGED By
PHILA D.A. FOR PERJURY AND pLED guilty
TO MAKING fALSE STATEMENTS At PRELIMINARY
HEARING, SENTENCE To 7 years. ALSo, JUN 1984
The statement Mode to the POLICE WAS fALSE.

SIGN Franklin Lee
DATE 1/2/21

Commonwealth of Pennsylvania
County of Dauphin

Subscribed and sworn to before me on January 2,
2021, by Franklin Lee.

Jeffrey A. Kuhn
NOTARY PUBLIC

Commonwealth of Pennsylvania - Notary Seal
Tiffany A. Kuhn, Notary Public
Dauphin County
My Commission Expires July 17, 2022
Commission Number 1335675

My Commission expires 07/17/2022

Case: 09-3628   Document: 00319809963   Page: 62   Date Filed: 09/14/2009

COMMONWEALTH OF PENNSYLVANIA       :

COUNTY OF PHILADELPHIA             : SS: A̲F̲F̲I̲D̲A̲V̲I̲T̲


  I, F r a n k   Roosevelt Lee, being duly affirmed, according to law, deposes and says that the allegations made below are true and correct to the best of my knowledge and belief:

  1. That on or about January 19,1984, I was brought to the Police Administration Building, located at 8th Race St. On that date I made a statement against Willie Stokes implicating him in a homicide.

  2. On or about May 30,1984, I was brought to City Hall at 2:00 PM as a forthwith to court, to testify at the Preliminary Hearing of Willie Stokes.

  3. On that date I testified under oath that myself, Willie Stokes and Anthony Singleton were in my basement around 82' around Christmas close to New Years,we was drinking beer and smoking marijuana, I said that Willie Stokes admitted to us that he killed Leslie Campbell.

  4. I first made a statement against Willie Stokes on January 19,1984, and I testified at his Preliminary Hearing, the truth is I was trying to get out of jail. Willie Stokes wasn't in my basement nor did he tell me anything about killig anyone.

  5. I admit that I falsely testify at all legal proceeds that involved Willie Stokes


*Exhibit "H"*

Case 2:20-cv-02192-TJS   Document 21-1   Filed 10/20/21   Page 17 of 108

Case: 09-3628   Document: 00319809963   Page: 63   Date Filed: 02/24/20...

Case: 09-3628   Document: 00319809963   Page: 63   Date Filed: 09/14/2009

I verify that the statement made within Affidavit are true and correct.
I understand that any false statements herein are made subject to the penal-
ties of 18 Pa. C.S. § 4904, relating to falsification to authorities.

/s/ _Frank Roosevelt Lee_
Frank Roosevelt Lee

_Frank Roosevelt Lee_

Sworn and Subscribed to before
me this ___19___, day of
___October___, 2005

_____
Notary Public

NOTARIAL SEAL 10/19/05
GERALD SOBOTOR, Notary Public
Skippack Twp., Montgomery County
My Commission Expires November 30, 2008



Jailhouse informants say that Philadelphia homicide detectives traded sex and drugs for testimony in murder cases — and that innocent men are serving life in prison as a result.

by Samantha Melamed
Published Jul 20, 2021

*This is Part 3 of Losing Conviction, a series about homicide investigations in Philadelphia.*

It was 1984 and Franklin Lee was locked up at a Philadelphia jail awaiting trial for serious crimes, including a rape he admits to and a murder he denies any part in.

Lee made a desperate decision — one with consequences he says he is still trying to atone for today.

It started, he said, when homicide detectives Ernest Gilbert and Larry Gerrard sent a wagon to bring him down to the Police Administration Building. "We

went in an interrogation room. They came in with four or five files. And they said, 'If you will help us, we can help you.' I said, 'What do you mean?' They said, 'We are trying to clean up these homicides.'"

He said the detectives, part of the Special Investigations Unit specializing in cold cases, told him they were "cleaning the books."

They asked him about a neighborhood man, Willie Stokes: Did Lee know anything about Stokes shooting up a dice game four years earlier and killing a man named Leslie Campbell?

"I said, 'I don't know nothing about that.' And they said, 'That's not what we want.'"

As Lee would later testify, the detectives instructed him to fabricate a statement claiming Stokes bragged about the murder. In return, he said they offered a lenient sentence — and an unusual way to make his jail stay more enjoyable.

The deal, according to Lee: regular visits to the Police Administration Building, known as the Roundhouse, where Lee could have sex in interview rooms. The women could freely bring drugs and money, he said.

He took the detectives' offer. And when his girlfriend soured on the unseemly setup, a detective brought in a sex worker, he said. "They gave me condoms."

Lee is one of at least a dozen people who have claimed in affidavits, testimony, or Inquirer interviews that the same Philadelphia homicide detectives, who have since died, facilitated sexual encounters in the Roundhouse to induce cooperation — a scheme some lawyers have termed "sex for lies."

While police, prosecutors, and judges have found such claims incredible, new admissions from informants obtained by The Inquirer describe a pattern of misconduct in the Homicide Unit in that era. Stokes is one of at least six men still in prison due to testimony from those jailhouse informants, much to Lee's shame.

7/20/2021

Informants say Philly cops traded 'sex for lies' in murder cases



Willie Stokes is seen in family photographs taken in prison, with his mother, Gloria Williams, and (from left) with siblings Renee, Curtis, Carolyn, and Regina Stokes.

Philadelphia has counted 22 homicide exonerations in just over three years — but none involving cases as old as these, all dating from the early '80s. "They don't want to go back that far, because they know what [Police Commissioner Frank] Rizzo and all them done," said Major Tillery, one of the men who have raised the allegation. Lawyers argue it's part of a pattern of manipulating evidence and coercing witnesses that continued for decades. They trace that through line from the 1970s, when confessions were sometimes obtained using violent interrogation tactics, up to the 2000s, when dozens were convicted based on work by Detective Philip Nordo, who is now charged with raping suspects and manipulating investigations.

## Losing Conviction

Philly's exonerations raise questions about decades of homicide investigations and whether the misconduct alleged in those cases was part of a pattern that led to many more wrongful convictions.

» **Part One: Losing conviction**

» **Part Two: One detective, dozens of allegations**

» **Part Three: 'Sex for lies'**

» **Search the database**

One man who raised a "sex for lies" claim involving the same two detectives was released in 1990 after he attributed his own murder confession to sexual coercion. At a post-conviction hearing, three women testified they'd had sex with the man, Arthur Lester, at the Roundhouse, according to a Superior Court opinion, which also cited visitor logs.

The Philadelphia Police Administration Building visitor log shows Detective Larry Gerrard escorting jailhouse informants Charles Atwell and Jerry Fields, and Atwell's girlfriend, Maxie Harris. At right are Inqu … Read more
JESSICA GRIFFIN / Staff Photographer

"We find that the police's offer of sex constituted a provocation powerful enough to coerce Lester to cooperate," the court opined.

The DA's Office did not contest the allegations in that case but has adamantly rejected similar claims in the years since. A spokesperson said the office could not comment on the cases, because they either had pending petitions or were not under review. A Police Department spokesperson had no information on the allegations but noted "the Department has taken steps to ensure the integrity of investigations remain intact."

Detective Gerrard was quoted at the time in the Daily News as laughing off Lester's allegations: "That's a lie. He'd have to have been doing it with the captain. He's guaranteed to get AIDS and everything else you can catch if that's what he did. Nothing but dirt and metal chairs in those rooms."

The "sex for lies" allegation was raised again in a 1997 hearing for an unrelated case, in which three co-defendants sought to prove detectives' inappropriate treatment of jailhouse informants. The girlfriend of a known informant — Anthony Singleton, who had given statements about Stokes and others — testified about the trysts. "He said he got that privilege for testifying," she told the court. The prosecutor asked if perhaps instead she had merely brought in a dinner for Singleton. "No," she testified. "I *was* dinner."

# "We find that the police's offer of sex constituted a provocation powerful enough to coerce Lester to cooperate."

— Pennsylvania Superior Court opinion in Commonwealth v. Lester

As for Lee, he expected only a seven-year prison sentence when he testified against Stokes at his preliminary hearing.

But afterward, Lee said, his mother shamed him. "You don't even know that boy," he recalled her saying. "Why are you doing that?"

At trial, Lee recanted. "The police made me make this statement," he testified. "They said if I didn't cooperate with them, they would talk to Judge [Albert] Sabo and hang me."

# THE HOMICIDE FILES

VIEW THE FULL DATABASE →

**1980**

**Detective(s) involved**
Ernest Gilbert   Lawrence Gerrard

**Case outcome**
Convicted

**What's alleged**
A man said detectives coerced his statement about a murder with sexual favors and threats. He testified at a preliminary hearing but recanted at trial — and was convicted of perjury for his initial testimony. The murder case went forward anyway.

**Case details**
The fatal shooting of Leslie Campbell, during a street dice game in North Philadelphia, went unsolved for four years — even though a second man, Francis Dinkins, had also been shot and survived. Then, Franklin Lee and

Read More

**Allegation(s)**
Threats   Physical Abuse/Force
Manipulation/ Destruction of Evidence
Supplying of False Information/Evidence

**Case documents**
Preliminary hearing transcript
Trial transcript of Franklin Lee's testimony
Stokes' petition with DA's request for a hearing and Lee's perjury charging sheet
Anthony Singleton's unsigned affidavit
Post-conviction testimony of Francis Dinkins

Last Updated: 6/21/2021

The prosecutor, John DiDonato, responded by introducing Lee's cooperation agreement into evidence, according to the transcript. "You know right now we are going to go back before Judge Sabo and say, 'Judge, he reneged on his deal with us. He admitted to lying on the stand and he should get the maximum.'"

Then, according to the transcript, DiDonato ripped the cooperation agreement. (DiDonato did not respond to interview requests.)

7/20/2021

Informants say Philly cops traded 'sex for lies' in murder cases

Nine days after Lee recanted, he was charged with perjury. The criminal complaint reads: "False statement — Defendant stated Willie Stokes told him he killed Leslie Campbell."

Instead of the lenient sentence, Lee received a minimum of 35 years in prison. That included 3½ to seven years for perjury. He was paroled in 2019.

**» READ MORE:** *Philly's exonerations raise questions about decades of homicide investigations*

Singleton, who had implicated Stokes in a statement, also changed his mind and refused to testify, according to an undated written statement. At Singleton's sentencing, the prosecutor emphasized that he had reneged on his offer to cooperate. The judge sentenced him to 40 to 80 years in prison. Singleton died in jail behind what these cops did," Lee recently said.

At trial, Stokes felt a flood of relief after Lee recanted. The prosecution's case now hung on two imperfect eyewitnesses: one who failed to identify Stokes, and the other who placed Stokes at the scene holding a gun but not shooting.

"That was the whole trial," Stokes said by phone from prison. "I thought they was going to let me go."

Instead, he was convicted of first-degree murder.

"I never seen the streets since," he said.



Gloria Williams, whose son Willie Stokes has been incarcerated for decades, has never stopped believing in his innocence.
JESSICA GRIFFIN / Staff Photographer

## From stick to carrot

Michael Chitwood, a Philadelphia homicide detective in that era, said he recalled rumors of Roundhouse trysts, but no proof.

He acknowledged that, sexual favors or not, jailhouse snitches are problematic. But, he added, "What you're seeing today is the informant all of a sudden recants — and that isn't necessarily true."

Still, experts say such cases demand scrutiny. Jailhouse informants are a leading factor in wrongful convictions, involved in one in six cases resulting in DNA exonerations, according to an Innocence Project analysis.

"Jailhouse informants are kind of the third rail of prosecutorial behavior," said R. Michael Cassidy, a Boston College law professor and expert on prosecutorial ethics. "I think most savvy prosecutors will avoid them at all costs."

They come with impaired credibility, given their ulterior motives. In addition, he said, the obligation to reveal all promises, rewards, and inducements — from a reduced sentence down to increased phone time in prison — places a burdensome discovery obligation on the prosecution.

As for the inducement of sex and drugs, he said: "That would be what's called a 'shock the conscience' due-process violation. That would be egregious behavior that would probably make the whole statement inadmissible, even if the behavior was disclosed."

At the time, however, Philadelphia detectives were known to go to great lengths to close cases. In the mid-1970s, Philadelphia judges were tossing out one in five homicide confessions because of improper tactics, including brutal interrogation-room beatings.

## "[Offering sex and drugs] would be egregious behavior that would probably make the whole statement inadmissible."

— R. Michael Cassidy, Boston College professor of law

An Inquirer exposé shed light on the worst abuses, leading to federal charges and a Department of Justice investigation.

"New systems went into effect," said Leon Lubiejewski, a homicide detective then. "There was audiotaping then videotaping of confessions. Then we had the six-hour rule, that you can only have the defendant for six hours before arraignment."

Informants say Philly cops traded 'sex for lies' in murder cases

For a few years, case clearance rates plummeted — from 91% in 1976 to just 60% in 1980.

Then, they rebounded. Michael Diamondstein, Stokes' lawyer and a former prosecutor, said these 1980s cases demonstrate that abuses continued. In Stokes' case, he described a nesting doll of constitutional violations, from Lee's concealed perjury charges to evidence the prosecutor illegally struck Black people from the jury pool.

"It is an unfortunate reality of the history of Philadelphia that allegations of inappropriate conduct by Philadelphia police officers and detectives have been routinely ignored," he said.

**» READ MORE:** *Dozens accused a detective of fabrication and abuse. Many cases he built remain intact.*

If detectives shifted tactics from stick to carrot, several snitches said access to sex was a highly motivating carrot.

"They did that for me, too," said Michael Griffin, who was jailed for robbery charges in 1984. He said he truthfully testified against a codefendant, but access to sex was a strong inducement.



Craig Jackson, shown in Philadelphia in 2021, said he watched homicide detectives come to Holmesburg Prison and pick up jailhouse informants, who bragged they had access to sex and drugs.
JESSICA GRIFFIN / Staff Photographer

The practice was an open secret, according to Craig Jackson, who was jailed in Holmesburg Prison. He said he witnessed detectives escorting Singleton, Lee, and others. "They would pick guys up from the county jail and take them down the Roundhouse to have sex in exchange for false testimony of people they wanted to get off the street."

As the drug trade took hold in North Philadelphia, unsolved murders piled up for the cold-case detectives.

They believed some of the slayings were connected to the Black Mafia, making them extraordinarily difficult to crack.

"If you talk about the '70s, there were no informants about Black Mafia. No one would cooperate," said Sean Patrick Griffin, a criminal justice professor at The Citadel and the author of several histories of the organization. "People not only didn't trust the cops, but also were incredibly fearful of Philly's Black Mafia."

That appeared to change with the use of jailhouse informants. As Gerrard would testify years later, "There was a whole group from the neighborhood up there who were telling on each other about the murders. There were, I don't know, maybe eight, 10 unsolved murders that we cleared at that time."

0:42

Courtesy of Rachel Wolkenstein
In a video filmed in 2016, Emanuel Claitt confessed he gave a false testimony after Philadelphia detectives allowed him to have sexual encounters in exchange.

One man, Emanuel "Manny" Claitt, was in prison with eight or nine pending cases, he said in a 2016 affidavit, when he was given a choice: Face a life sentence, or get lenient treatment and the chance to meet four of his girlfriends at the police headquarters or in hotel rooms. (Roundhouse visitor logs document at least one of those meetings.)

Claitt became a valued witness, describing a web of Black Mafia violence. His statement cracked the 1976 cold-case murder of Joseph Hollis in a North Philadelphia pool room.

A second man was shot in the attack but survived and quickly identified the killers as "Ricky" and "Dave." It's not clear what became of that lead.

Instead, four years later, Claitt identified the shooters as William Franklin, who police said owned the pool room, and Major Tillery, whom police labeled "the

Informants say Philly cops traded 'sex for lies' in murder cases

East Coast Speed King" and placed atop the city's first-ever "Most Wanted" list. Claitt also said Tillery firebombed two houses.

Both men have maintained their innocence. In a statement and a video made before his death in 2020, Claitt said it was all lies.



Major George Tillery shown here in 1979 in a police handout photo, and years later in prison. Handout

Claitt alleged prosecutors coached his testimony, in concert with Detectives Gerrard, Gilbert, and Lubiejewski. Claitt said that when he tried to recant, Lt. Bill Shelton threatened to frame him for another murder.

Shelton, Gerrard, and Gilbert are all deceased. Attempts to interview Lubiejewski about the case were unsuccessful.

Letters from prosecutors offer a window into Claitt's favored status. They repeatedly sought to lift parole detainers and bail, citing Claitt's importance to the prosecution of Tillery, Franklin, and others.

"None of these cases could have been brought to trial without Mr. Claitt's statements," Assistant District Attorney Leonard Ross told a judge at a 1981 sentencing hearing. "The two homicide matters as well as the bombings, although we basically knew who was involved, Judge, we had no hard evidence to present to a court until Mr. Claitt made his statements."

Ross declined an interview request.

Claitt waited decades to come forward, he said in his affidavit, because he feared retaliation by police or prosecutors. He served just 18 months, plus probation, for a series of violent crimes. "In exchange for my false testimony, many of my cases were not prosecuted," he said.

He also said detectives enlisted him to recruit another jailhouse informant: Bobby Mickens.

Informants say Philly cops traded 'sex for lies' in murder cases

"I was put in a police van to ride alone with Mickens," Claitt said, "... to make it clear to Mickens that he really had no choice except to testify against Major Tillery."

0:51

Jessica Griffin
Bobby Mickens tells The Inquirer how homicide detectives falsified his testimony to convict another man of murder.

*» Watch The Inquirer's interview with Bobby Mickens on YouTube*

In an interview, Mickens, 69, said that by the time of that van ride, detectives had already unsuccessfully tried to coerce his cooperation. It was Claitt who convinced him, telling him Tillery had snitched first. He said Claitt advised, "'Don't let him set you up. If anything, you turn it back around on him.' And that's what I did."

Eight years after Hollis' murder, Mickens accused Tillery. According to Mickens, whose sworn affidavit was filed in court, Detectives John Cimino and James McNesby brought their case file into the room, fabricating statements for him to sign.

"I followed up on what Manny said to me in the police van," Mickens said, "and that's how I got caught up in this web of lies with the police."

As an added incentive, he said, the detectives let him meet a girlfriend in an interview room with paper over the two-way mirror. "They let you do your thing, whatever you do. You could hug and kiss, intimacy, or you could just talk."

Like Claitt, Mickens alleged that prosecutors were in on the fabrication. He said in the affidavit that Assistant District Attorney Barbara Christie "scripted and rehearsed" his testimony.

She didn't promise a specific sentence, he said in an interview. "She just said I'd be all right. 'You'll be all right. You'll be home soon.'"

Christie, reached by phone, said she did not work on Tillery's prosecution, but in any case could not comment on office matters. Cimino is deceased. Attempts to reach McNesby were not successful.

In a filing this year, Assistant DA Samuel Ritterman called Claitt's and Mickens' statements unbelievable claims by "career criminals."

"Even if all of these police and prosecutors had the requisite level of malice to fabricate their entire case," the prosecutor wrote, "they would also need the creative abilities of the very best novelists."

After Mickens testified, he was sentenced to 2½ to five years for rape and robbery — but released on parole.

He said it wasn't until years later that he realized the meeting with Claitt was a setup: "I started looking back, and these guys are doing life sentences for something I did. That wasn't right."

Franklin has served 41 years. Tillery has done 36.

"There was never no evidence, no fingerprints, no weapons, no ballistics," Franklin said.



Shirley and William Franklin, who were married more than 40 years, are shown when they were young and many years later after Williams' long incarceration.
Handout

Tillery, 70, became a renowned jailhouse litigator — and a lightning rod who served close to 20 years in solitary confinement.

In 1987, he drafted a lawsuit about prison conditions at the State Correctional Institution Pittsburgh that forced a $30 million renovation. He obtained another settlement after alleging First Amendment retaliation for medical grievances. More recently, he designed a seniors' program being piloted at a state prison in Chester.

His early prison career was also rife with allegations summarized by one federal judge as "numerous challenges to procedure, attempted orchestrated assaults against staff and inmates, and organized gambling, in addition to a long history of gang-related criminal activities." Tillery denies much of that.

Franklin, a 74-year-old grandfather, is fighting for a few years with his family, he said. His wife died in February, after four decades of prison visits.

"He's been a consistent part of our lives since we were born," said Gina Gibson, one of four daughters. "We want our dad home."



Sisters Lisa Justice (left) and Rasheedah Franklin use a tablet to talk with their sister Gina Gibson. They're at Lisa's house in Philadelphia, where an image of their mother, Shirley Franklin, is shown on a blank ... **Read more**
JESSICA GRIFFIN / Staff Photographer

## 'Their little chess game'

Since Arthur Lester was released in 1990, no other case has been overturned based on a sex-for-lies claim.

Yet, the allegation has repeatedly been raised in court.

In 1997, three men convicted of the 1982 drive-by shooting of Fred Rainey in North Philadelphia — Andre Harvey, Russell Williams, and Howard White — presented the claim regarding the key witness against them, Charles Atwell.



The three men convicted of the 1982 murder of Fred Rainey are (from left) Howard White, seen prior to arrest; Russell Williams with his grandson; and Andre Harvey, on a visit with daughter Sonya Barlow. Handout

Atwell didn't accuse them until nine months after the murder, when he was jailed on aggravated-assault charges. Detectives have acknowledged that Atwell, while incarcerated, was able to repeatedly meet with his girlfriend at the Police Administration Building. After he testified, the DA's Office dropped the charges against him. But Atwell and the prosecutor denied any undisclosed benefits.

Among those who disputed that were Archie Scott, a man who gave a statement to Harvey's investigator saying that he witnessed Rainey's murder; that Harvey, White and Williams were not the killers; and that detectives offered both him and Atwell sexual favors to manipulate their statements.

At the 1997 hearing, a former girlfriend of Atwell's, Maxie Harris, testified that she and Atwell were permitted intimate visits at the Roundhouse.

Atwell's nephew, Douglas Atwell, backed up that claim, adding that Atwell had asked him to deliver 40 packets of PCP there. He testified he turned the drugs over to Detective Gerrard — and afterward inadvertently walked in on Atwell and Harris having sex.

Gerrard denied receiving drugs, or ever leaving Atwell and Harris alone in a room. "He would have been cuffed to the chair and the door would have been open," Gerrard testified.

Two years after the 1997 hearing, Philadelphia Common Pleas Court Judge Genece Brinkley ruled that Atwell and Gerrard were credible, while the other witnesses were not.

Atwell did not respond to interview requests. Craig Jackson, the man who was locked up with Lee, Singleton, and Atwell, said Atwell is in a difficult position.

"He had the cops threatening to put cases on him if he didn't testify," he said. "They just made people part of their little chess game."

7/20/2021

Informants say Philly cops traded 'sex for lies' in murder cases



Douglas Atwell, seen in West Philadelphia, was a teenager when he said he unwittingly trafficked drugs into the Police Administration Building.
JESSICA GRIFFIN / Staff Photographer

Douglas Atwell, a teenager then, said it took him decades to understand the context of the strange visit. "If I'd known then what I know now, I would have spoke up," said Atwell, 54.

Harvey, 58, is a grandfather now, and an organizer with the antiviolence group Real Street Talk. Williams, 63, has developed heart problems. White, 72, has stage four prostate cancer.

4:20

Raishad Hardnett, Astrid Rodrigues, Jessica Griffin
Sonya Barlow's father has been in prison for 38 years. Barlow believes her father was framed by homicide detectives in order to solve a murder case.

Harvey's daughter, Sonya Barlow, 41, said she's visited almost every Sunday since she was a child.

After the hearing in 1997, she was convinced the revelations would set him free.

"You couldn't tell me my dad wasn't going to be home for my 12th-grade graduation. When that didn't happen, I cried for two weeks straight."

## 'He shouldn't be in there'

Mickens testified in four cases altogether, he said in an interview. Claitt said in his affidavit he gave information in seven cases. The extent of cooperation by Atwell and others — and what benefits they received — is not apparent from publicly available court records.

At least seven states have passed laws regulating jailhouse informants, creating databases tracking their use and the benefits the informants received, or requiring cautionary jury instructions. State Sen. Vincent Hughes, a Philadelphia Democrat, introduced legislation in Pennsylvania, but the bill has yet to receive a hearing.

"This comes down to the reliability and the integrity of evidence that's being offered in criminal court," said Rebecca Brown, policy director for the Innocence Project. "It is impossible to evaluate that evidence without a full picture of the informant's history and perceived or real leniency."

But overturning cases involving even discredited informants remains difficult, said Harvard law professor Alexandra Natapoff, author of *Snitching: Criminal Informants and the Erosion of American Justice.*

Often, courts find even undisclosed benefits aren't sufficient to overturn a conviction, Natapoff said. In her view, the law has not caught up to the growing understanding of the problem: "The more we learn about the serial quality of jailhouse informant unreliability, the greater the need for the law to adjust so that we can revisit old convictions that we now know to be based on unreliable testimony."

In Stokes' case, he found a new avenue into court after discovering paperwork linking Lee's perjury conviction to his preliminary hearing testimony, not his recantation. In June, the DA agreed to a hearing.

Informants say Philly cops traded 'sex for lies' in murder cases



The family of Willie Stokes, who has been in prison for four decades, had hoped to have him home to celebrate the 80th birthday of his mother, Gloria Williams, seen with her daughter Renee Stokes.
JESSICA GRIFFIN / Staff Photographer

If granted, it would be Stokes' first evidentiary hearing since 1989.

At that hearing, Francis Dinkins — the sole surviving victim of the 1980 shooting — testified that Stokes was innocent. Dinkins said he had told police that. But, he said, detectives assaulted him. Eventually, he testified, "I did sign a statement under force." He said after he refused to testify against Stokes detectives warned him to stay away from the trial.

Since then, Stokes also received an affidavit from the only witness who placed him at the scene with a gun.

That man, Darryl Hargrove, said he remembered little except that police hauled him out of bed for questioning around 3 a.m. He said he didn't see the shooting but walked up as people were scattering, contradicting his trial testimony.

"He shouldn't be in there," he said of Stokes.

Stokes, 59 now, has spent his adult life incarcerated. He still prays to come home in time to spend some good years with his mother, Gloria Williams, who turns 80 this month.

"We've been waiting 40 years," his sister Renee Stokes said, "so we'll see what happens."

Informants say Philly cops traded 'sex for lies' in murder cases



Gloria Williams, at home in Philadelphia, was encouraged by a recent court filing agreeing her son should be granted a hearing.
JESSICA GRIFFIN / Staff Photographer

## STAFF CONTRIBUTORS

**Reporting:** Samantha Melamed

**Editing:** James Neff

**Visuals:** Jessica Griffin, Raishad Hardnett, Danese Kenon, Astrid Rodrigues

**Photo Collage:** Inquirer Archive, Jessica Griffin, Rachel Wolkenstein

**Digital:** Ellen Dunkel, Dain Saint

**Copy editing:** Rich Barron

Published July 20, 2021

 Samantha Melamed ✉ 🐦

A reporter at the Inquirer since 2013, I cover issues of identity, race, social justice, as well as prisons and the legal system.

## Latest Headlines

J&J and three other companies are on the verge of settling opioid lawsuits

Photos of Islamic community of Philadelphia during Eid Al-Adha prayer.

This year marks the first Olympics for legalized sports betting across the United States. Why has a potential boon made bookies nervous?

Mayor Kenney's decision not to declare gun violence an emergency is an act of cowardice | Helen Ubiñas

Jeff Bezos' rocket soars into space with passengers aboard

Opioid Addiction

# EXHIBIT

# C

IN THE MUNICIPAL COURTS OF PHILADELPHIA
COURTROOM 675 - CITY HALL

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | MURDER, POSSESSION OF AN |
| | : | INSTRUMENT OF CRIME |
| vs. | : | |
| | : | |
| WILLIE STOKES | : | M.C. #84-03-2460 |

- - -

Philadelphia, Pennsylvania
May 30, 1984

- - -

BEFORE:   HONORABLE ARTHUR S. KAFRISSEN, JUDGE

- - -

APPEARANCES:     ROBERT CAMPOLONGO, ESQUIRE
Assistant District Attorney
For the Commonwealth

GEORGE GERSHENFELD, ESQUIRE
Attorney for Defendant

- - -

REPORTED BY:     THOMAS G. KENNEY
Official Court Reporter

- - -

4a

2

## I N D E X

| COMMONWEALTH EVIDENCE | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Darryl Hargrove | 6 | 14 | 22 |
| Franklin Lee | 40 | 42 | – |

- - -

4ᵒ 39

THE COURT:   Now, I don't want to have
to do that, but I will do it instantly.   Now,
finally, as far as this proceeding goes, as far
as each of you in it goes, if you have any business
here then you are certainly welcomed to stay.
However, anything that would rise to my feeling,
based on your actions, that you intend to impede
this trial, which means keep it from going smoothly,
I will hold the person that I see at that point
in contempt and imprison them.   Do you understand
that?

MS. JONES:   Yeah.

THE COURT:   This is your warning and
that is my order.   There is a protective order.
So, in essence, make sure that nothing can possibly
involve any of you in anything which might harm
that witness.   Thank you.   Have a seat.

MR. CAMPOLONGO:   If your Honor pleases,
our next witness will be Franklin Roosevelt Lee.
He's in the back.   I would ask him to be brought
forward.

— — —

FRANKLIN LEE, having been duly sworn,
was examined and testified as follows:

6a

41 70

- - -

BY MR. CAMPOLONGO:

Q.    Mr. Lee, do you know this defendant here, sir, Willie Stokes?

A.    Yes.

Q.    About how long have you known him?

A.    Say about six years.

Q.    Mr. Lee, did you have occasion at some time to have a discussion with this defendant, or conversation with this defendant, Willie Stokes, regarding the shooting death of Leslie Campbell which occurred on October 1st, 1980?

A.    Yes.

Q.    Can you indicate to the Court approximately when and where you had this conversation with the defendant?

A.    Around '82, around Christmas or close to New Years in my basement at my house.

Q.    That's the year 1982?

A.    Right.

Q.    I want you to go on in your own words and tell the Court what was said between you and this defendant regarding the shooting of Leslie Campbell at that time?

A.    Well, we was in my basement drinking beer, smoking marijuana, getting high. We was talking about that the

guy that they had caught for killing Reggie Hunter and

everybody was saying no, they don't think he got caught.

Willie Stokes just got to bragging telling us how he killed

Leslie Campbell.

Q.    When you say he was bragging about it, as near

as you can recall, sir, what did this defendant say at

that time?

A.    Well, he was saying that everybody don't get caught,

you know, when they kill somebody.   So, he went on to

say that he was gambling, gambling for about two days.

Q.    Right.

A.    And he said the first day they were gambling at

30th and Stiles and Campbell beat him out of a large sum

of money.

Q.    Right.

A.    Then he said the next day they was gambling at

30th and Girard and Campbell and a few other guys, Campbell

had broke him, beat him again.   He had asked Campbell

could he borrow some money to get back in the game.   Campbell

said he didn't have it.   So, Willie told us that he told

him don't be there when he comes back.   He said he left

and came back with some guy named Steven, and Campbell

was gambling, and he said what you going to do.   He said

Campbell got out, swung at him.   Willie Stokes said he

43

fired on him.

Q.     Now, when the defendant said he fired, did he say how many shots he fired?

A.     He said he just fired on him, you know, emptied the gun.

Q.     He said he emptied the gun?

A.     Yeah.

Q.     And did he say anything else to you at that time?

A.     He said if anybody else said anything they would get the same thing.

        MR. CAMPOLONGO:  Cross-examine.

                        - - -

                CROSS-EXAMINATION

                        - - -

BY MR. GERSHENFELD:

Q.     You gave this statement to the police?

A.     Yeah.

Q.     When did you give it to the police?

                MR. CAMPOLONGO:  Objection, your Honor.

                THE COURT:  Overruled.

BY MR. GERSHENFELD:

Q.     I'm sorry.  When did you give it to the police?

A.     Early part of the year.  I don't remember exactly.

Q.     Was that after they told you Willie Stokes had

given them a statement against you?

     MR. CAMPOLONGO:  Objection.

     THE WITNESS:  No, they never said that.

     THE COURT:  Overruled.

BY MR. GERSHENFELD:

Q.  Pardon me?

A.  They never told me Willie gave them a statement.

Q.  They never said that.  And how many people were down your basement?

A.  There was me, him, Anthony Singleton, Archie Scott and Gary Hart.  Five.

Q.  When did he tell you this happened?

A.  Around '82.  It was around '82, around Christmas.

Q.  And when did he tell you it had happened?

     THE COURT:  You mean when was the con-versation or when was the --

BY MR. GERSHENFELD:

Q.  When did he tell you this incident happened, the shooting?

A.  He never said when it happened.

Q.  Never said when it happened.  Did he say where it happened?

A.  He said it happened around on 30th, 30th and Girard.

Q.  Did he tell you who was shot, the person that was

involved?

A.    Leslie Campbell.

Q.    He said that?

A.    Yeah.

Q.    You're sure of that?

A.    Positive.

Q.    Were you drinking?

A.    Were we drinking?

Q.    Yes.

A.    We was drinking beer.

Q.    All of you were drinking, right?

A.    Yeah.

Q.    About how many beers had you had?

A.    We had like two quarts.

Q.    About how many beers did he have?

A.    He was just drinking.

Q.    Pardon me?

A.    He was just drinking out of the quart.

        THE COURT:   You mean between all of you you had two quarts or two quarts apiece?

        THE WITNESS:  No, all of us.

        THE COURT:   Four of you had two quarts?

        THE WITNESS:  Five.

        THE COURT:   Huh?

THE WITNESS:  Five.

THE COURT:  Five of you had two quarts and you were passing them around?

THE WITNESS:  Right.

BY MR. GERSHENFELD:

Q.    How long were you in the house drinking before this started?

A.    How long?

Q.    Yeah.

A.    Say about a good 20, 20 minutes.

MR. GERSHENFELD:  No further questions.

MR. CAMPOLONGO:  I have no questions. Thank you, sir.

THE COURT:  Thank you, sir.  You can step down.

Commonwealth rests?

MR. CAMPOLONGO:  The Commonwealth rests, if your Honor pleases, for the preliminary hearing.

THE COURT:  Willie Stokes, on Municipal Court Transcript 2460, March of '84, charging you with murder and possession of an instrument of crime, I find that the Commonwealth has made out a prima facie case against you.

This case will be sent to the district

47

attorney's office where they will prepare an infor-
mation or informations against you.

In the event they do so, you'll be
arraigned for trial June 13th, 1984, Room 875,
City Hall, twelve o'clock noon.

You're to be held without bail.

MR. GERSHENFELD: There's a bail request,
your Honor.

THE COURT: I'm going to hold him without
bail.

MR. CAMPOLONGO: It's a capital case,
your Honor.

If your Honor pleases, in addition I
would make a motion to add the charges of aggravated
assault and recklessly endangering other persons
sir, in that at the time the shots were fired there
were other persons in the area and other individuals,
other than the deceased was actually shot, your
Honor, according to the testimony of one of our
witnesses.

MR. GERSHENFELD: I object, your Honor,
to any amendment being made.

THE COURT: I'm going to sustain the
objection to the amendment only because the complaint

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL - TRIAL DIVISION

COMMONWEALTH          :     JUNE TERM, 1983

     v.               :

WILLIE STOKES        :    No. 666 to 668

Philadelphia, Pa., August 20, 1984

Courtroom 654, City Hall

BEFORE:   HONORABLE EDWIN S. MALMED, J. and a Jury.

PRESENT:

       JOHN DI DONATO, ESQ.
       Assistant District Attorney
       for the Commonwealth

       GEORGE GERSHENFELD, ESQ.
       for the Defendant

4.2

- - -   MORNING SESSION

———

MR. DI DONATO:  Good morning, your Honor.

THE COURT:  Good morning.

MR. DI DONATO:  May I proceed, sir?

THE COURT:  Proceed.

MR. DI DONATO: - The Commonwealth would call Franklin Lee.

———

FRANKLIN LEE, sworn.

DIRECT EXAMINATION

BY MR. DI DONATO:

Q       Mr. Lee, I want you to try to keep your voice up.  All the members of the jury have to hear you.  Will you try to do that for me?

A       Right.

Q       Mr. Lee, I want you to go back to October of the year 1980.  Did you know the decedent in this case, Leslie Campbell?

A       Yes.

Q       How long had you known Mr. Campbell?

Lee - direct                                        4.3

A       Well, really, the police made me make this statement, man.

Q       I am sorry?

A       The police made me make this statement.

Q       The police made you make this statement?  What statement are we talking about, Mr. Lee?

A       Willie Stokes.

Q       You know Willie Stokes?

A       Yes, I know him.

Q       How long have you known Willie Stokes?

A       I know him for a long time.

Q       Did you know Leslie Campbell?

A       I said the police made me make the statement.

            THE COURT:  Just answer the question.  You will have a chance to tell the rest of the story later.

        Right now answer the questions only.

BY MR. DI DONATO:

Q       Once again, did you know the dead man in this case, Leslie Campbell?

A       No.

Q       In October you didn't know him?

A       No.

Lee - direct                                    4.4

Q        All right.  Mr. Lee, in Christmas of 1982 did you have
occasion to be with this defendant at your house?

A        No.

Q        Okay, let's get to the statement that you say the police
made you make, Mr. Lee.

MR. DI DONATO:  Judge, obviously at this point
I would plead surprise and ask to be able to cross
examine this defendant, based on his statement and
prior testimony.

THE COURT:  Go ahead.

MR. DI DONATO:  Thank you.

BY MR. DI DONATO:

Q        Mr. Lee, you have spoken to me a couple of times before
you just took the stand today; is that correct?

A        One time.

Q        That's correct, and that was up in the cellroom,
upstairs?

A        Right.

Q        You just spoke to me a couple minutes ago?  You have
been down here since about 9:30; isn't that correct?

A        I just came in.  I don't know if it was 9:30.

Q        You read the statement that you gave to the police;

13a

Lee - direct                                          4.5

is that correct?

A        I looked at it, I didn't read it, because of Willie

Stokes never told me that in my basement.  Somebody else had

made the statement saying -- he told me that, and it was --

just so happened when I went down to the police they let me

read the statement they made.

Q        Let's do it this way.

             MR. DI DONATO:  I would like to have this marked

        Commonwealth Exhibit -- I believe it is 3.

             (Statement of Franklin Lee marked Commonwealth

        Exhibit Number 3 for identification.)

             MR. DI DONATO:  Counsel already has a copy of

        that statement, your Honor.

             MR. GERSHENFELD:  No legible copy, but I will

        go along with it.

BY MR. DI DONATO:

Q        Do you recognize your signature at the bottom of that

statement, Mr. Lee?

A        Yes, I recognize my signature.

Q        There is no doubt that that is your signature, is there?

A        That's my signature.

Q        At the time you gave this statement or at the time this

Lee - direct                                    4.6

statement was taken you were in jail for another murder case,
were you not?

A       Right.

Q       In fact you were arrested for the murder of one Lorenzo
Walker; isn't that true?

A       Right.

Q       And while you were in jail someone had told the police
that you had information about this killing?

          MR. GERSHENFELD:  I object, --

A       No.

          MR. GERSHENFELD:  -- to these questions, your

      Honor.

          THE WITNESS:  He had information.

          THE COURT:  What is the ground of this

      objection?

          MR. GERSHENFELD:  It has nothing to do with this,

      your Honor.  I believe, your Honor, it is prejudicial.

          THE COURT:  At the moment I will overrule you.

      We can go into it at a later point.

BY MR. DI DONATO:

Q       In fact in January, on January 19, 1984, the police,
Detective Gerrard and Detective Gilbert, brought you down to

Lee - direct                                   4.7

8th and Race and asked you questions about what you knew about

this particular murder; isn't that true?

A        No, they brought me down when they arrested me for

my murder.

Q        That was when?

A        After the other person that went down there said some-

thing about Willie Stokes came back, that's when.

Q        I see.  When was it that you signed this statement?

The date on this statement is January 19, 1984.  Are you saying

that is the wrong date?

A        I am not saying it is the wrong date but I am saying

the statement ain't true.

Q        The statement isn't true?  Let me read this statement

to you, Mr. Lee.  Then you tell me what in this statement isn't

true.

         "Question:  We are questioning you concerning

         the murder of Leslie Campbell which occurred on October

         1, 1980, at 936 North 30th Street.  Go on in your own

         words and tell us what you know about the murder of

         Leslie Campbell which occurred on October 1, 1980 at

         936 North 30th Street.

         "Answer:  It was around Christmastime or New

16a

Lee - direct                                    4.8

Years time, 1982, and Archie Scott, Gary Hart, Willie

Stokes, Anthony Singleton and myself were in my base-

ment where I sleep at.  We were sitting down there

drinking a little beer and smoking some reefer.  We were

all talking about how Reggie had got killed up at 20th

and York Street and that boy Charlie never got locked

up.  Then Willie Stokes started bragging about how he

got away with killing Campbell.  Then he started telling

us how it went down.

"He said that him and the guy had been gambling

and the guy had beat him out of some money.  Then the

next day he had seen the boy Gregory around 30th and

Girard and they were shooting craps and Gregory had

beat Willie again and they started arguing.  Willie

wanted Gregory to give him some of his money back, so

he could get back in the game and win some of his money

back.  Gregory said no.  Willie told him, 'Don't be here

when I come back,' and Willie said he left and came

back with some guy named Stephen.

"Gregory was still gambling.  Willie asked him

what he was going to do, and Gregory folded his money

up and put it in his pocket and they started arguing,

Lee - direct                                4.9

and Gregory took a swing at him and missed and Willie

emptied his gun on him.  Then he said that if anyone

said anything they would get the same thing.  Then they

left.  Willie didn't say where him and Stephen went

after this."

       Do you remember saying that?

A     I said that after they had me -- after they had me sign

the statement.  Basically that's the same thing he said.  I

just pictured it from there and went along with what he was

talking about.

Q     According to you now there was another guy named

Anthony Singleton who had told the police the same thing?

A     That's right, basically the same thing.

Q     Then you figured you would just copy the same thing and

say --

A     I didn't copy it.

Q     -- say the same thing you did copy?  When you signed

this, this was all a lie, I presume?

A     It was something they had put together.  They told us

they wanted Willie Stokes' body, that they would make deals

and everything.

Q     The police told you they wanted Willie Stokes to buy,

Lee - direct

4.10

meaning to convict an innocent man; is that correct?

A        Gerrard and Gilbert.

Q        Why didn't they get you to try to say you were an eye

witness to the shooting?

                    MR. GERSHENFELD:  I object.

                    THE COURT:  Overruled.

BY MR. DI DONATO:

Q        Since you were going to lie, Mr. Lee, why --

A        I am not lying.

Q        Why don't you just come in and tell the jury that you

were at the game, you saw the whole shooting, and that Willie

Stokes did it?  Did they ever suggest that to you?

A        I am not lying, I am telling the truth.

Q        My question is did they ever suggest to you that you

were an eye witness?  Didn't they  make you try to be an eye

witness?  Wouldn't that have made more sense?

A        They ain't say nothing, they just let me read the state-

ment.  That told me to make something out of that, what's there.

Q        What were you going to get out of all this?

A        After I made the statement on Reggie Walker, that I was

there when the killing took  place, that's when they had showed

me that.  They said, "Anthony Singleton said you were there and

19a

Lee - direct                                    4.11

know about it.

Q        Just so the jury isn't confused, you have to remember they don't know your background.  You had first got arrested for a rape case; is that correct?

A        Right.

Q        And then you got arrested for the murder of one Lorenzo Walker?  That's what you were in  jail for?

A        Right.

Q        Is that correct, and you were questioned abour Lorenzo Walker's murder and you told the police that you were there during that murder but you didn't do it; is that correct?

A        That's right.

Q        You said a guy by the name of Archie Scott did it?

A        He did do it.

Q        And then after that they asked you about this case, the killing of Leslie Campbell; is that correct?

A        They asked me about it.  I told them I didn't know nothing about it.

Q        Did you tell them you knew Willie Stokes and were a good friend of Willie Stokes?

A        Yes, I told them I knew Willie.

Q        How long had you known Willie Stokes, or how long have

Lee - direct                                        4.12

you known him?--

A        Six years.

Q        In fact you guys have been up to prison together, have

you not?

A        Once.

Q        Now, Mr. Lee, when you were brought down to say -- to

make up this whole statement what did you get out of all this?

Why did you lie and sign that statement?

A        Because they said if I didn't cooperate with them they

would talk to Judge Sabo and hang me.

Q        In other words you  made a deal at that time, in your

mind; correct?

A        I didn't know what to do.  I ain't never been through

this.  I never been in prison.  I ain't know what was going on.

Q        I didn't hear that.  You have never been through what,

Mr. Lee?  You have never been arrested before?  You have never

been through the system before?

A        I ain't say I never been through the system.  I am

talking about the way they --the way of they made me put this

burden on this man.  That's what I am talking about.

Q        So you knew at that time that  your friend, Willie

Stokes, was an innocent man; is that correct?

Lee - direct                                                    4.13

A       He ain't never told me he killed nobody, so --

Q       Why did you wait until this morning to say that?  Why
didn't you tell me this morning when I saw you in the cellroom
and I talked to you this morning?  Is there any particular
reason for that?

A       After you left out Gerrard and Gilbert, Gerrard was in
there.  He told me that if I didn't cooperate or do whatever
that he would see Judge Sabo.

Q       Then you should be afraid of that now, shouldn't you?
Don't you know that now?  That's what they are going to do.
That's what I am going to  do.  I mean didn't we have a signed
agreement here with you, Mr. Lee, signed by your attorney?

                    MR. GERSHENFELD:  May I see it?

BY MR. DI DONATO:

Q       Arthur Dixon?

                    MR. GERSHENFELD:  May I see a copy of the agree-
            ment, which was not provided before?

                    (Mr. DiDonato handed a document to Mr.
            Gershenfeld.)

BY MR. DI DONATO:

Q       Mr. Lee, on January 19, 1984, when you signed this
statement that you say the police forced you to sign, what did

Lee - direct

4.14

you think you were going to get out of it?

    MR. GERSHENFELD: I object.

    THE COURT: Overruled.

A    What did I think I was going to get out of it?

Q    Yes, what did you think you were going to get out of it? They forced you to lie against an innocent man; isn't that correct?

A    That's right.

Q    All right, so as far as you were concerned you were brought down to 8th and Race Street, and the police are now saying to you, "Frankie, we want you to lie about some innocent friend, we want you to just make something up."

    That's what you want these people to believe; is that correct?

A    I never went down to 8th Street, anyway. It was Anthony Singleton that went down there first.

Q    I know that. After Anthony Singleton told the police what he told them the police then came and saw you; is that correct?

A    Yes.

Q    And they said to you, "Anthony Singleton told us certain things, we want to now hear your version of it."

Lee - direct

4.15

— — Is that correct?

A        Right.

Q        Then this statement was taken, which you signed?

A        I told them I didn't know no version of it.  That's when they let me read Anthony Singleton's statement.

Q        How did they get you to sign that statement that you knew was a lie?

A        Because I went along with it.

Q        I am sorry?

A        I went along with it.  I wanted to make a deal to get out of jail.

Q        In  other words they didn't beat you up or anything, did they?  Did they beat you?  Physically, did they punch you in the face?

A        They scared me enough.

Q        So you made a deal; is that correct?

A        They made a deal, I didn't make nothing.

Q        Isn't it true that at that time you were pleading not guilty to the murder of Lorenzo Walker?

A        That's right.

Q        In fact you pled not guilty  all along up until June of this year; isn't that true?

Lee - direct                                    4.16

A        That's right.

Q        So if you had a deal made when you signed that statement
why didn't you just plead guilty then?

A        That's what they told me to go down there and do,
plead guilty.  That's what I did.

Q        You didn't do that until June, though, isn't that
correct, Mr. Singleton?  Excuse me, Mr. Lee?

A        That's right.  It was after Anthony Singleton opened it
back up.

Q        In fact this agreement with your signature on it --

            MR. DI DONATO:  I would like to have this
marked Commonwealth Exhibit 4.

            MR. GERSHENFELD:  I object, your Honor.

            THE COURT:  Let me see it.

            MR. DI DONATO:  I have the original here, your
Honor.

            (A document was handed to the Court.)

            THE COURT:  All right, now, where are we here?
Is there an objection to this?

            MR. GERSHENFELD:  Yes, sir.

            THE COURT:  To the use of that?  All right, I
will overrule it.

Lee - direct                                    4.17

          -- MR. DI DONATO:  Thank you, your Honor.

          (Agreement marked Commonwealth Exhibit Number

     4 for identification.)

BY MR. DI DONATO:

Q       Mr. Lee, let me try to do it this way.  On January 19,

1984, the beginning of this year, you say that you signed the

statement and that it was a lie; is that correct?

A       That's right.

Q       All right, and you thought that you were going to get

a deal at that time, that's why you did it; correct?

A       No, I did it because they had already had me to make a

statement, to say I was there, that if I didn't do it they would

get Anthony to testify on me.

Q       So you were afraid about your own murder case; is that

correct?

A       That's right.

Q       You just told the jury a couple minutes ago that you

were going to be pleading guilty anyway?

A       I already did plead guilty.

Q       You didn't plead guilty and the transcript reveals you

didn't plead guilty to the murder case until June 8, 1984.  We

are talking about way back in January of '84, you had just been

Lee - direct

4.18

arrested;   do you remember that?

A      I was arrested in January of '83.

Q      That's right, a whole year before that.  For a whole
year you had been pleading not guilty, you remember that, don't
you, and you and your attorney had to come to court and say to
the judge, "I plead not guilty"; correct?

A      That's right.

Q      You just told the jury  a couple minutes ago that on
January 19th of 1984 when you signed the statement that you now
say is a lie, you were going to plead guilty then.

           Now, which is it that is true?

A      Which is it that is true?  Like I said, I didn't plead
guilty until after I made the statement.

Q      But you didn't plead guilty until June of this year;
isn't that correct?

A      That's right.

Q      All right.  After you signed the statement you went back
to jail; is that correct?

A      Right.

Q      Did anybody threaten you in jail to get you to try to
change your mind?

A      Did anybody threaten me?

Lee - direct                                                    4.19

Q        Yes.  ~~You~~ had lied about some poor innocent guy, your
friend, Willie Stokes.

                 Isn't that true?

A        No one threatened me.

Q        I am sorry?

A        No one threatened me.

Q        Okay, so from January of 1984 up until <u>May 30th of
1984</u> you were in custody, were you not?

A        That's right.

Q        And all during that period of time did you ever contact
your attorney, Arthur Dixon, and say, "The Police forced me to
lie about willie Stokes"?

A        No, I never called him.

Q        Why didn't you tell your attorney all this?

A        Why didn't I tell my attorney all this?  Because I said
I am going to tell the truth today, what really happened.

Q        What did you do when you went to the <u>preliminary hearing</u>,
this defendant's preliminary hearing, on <u>May 30, 1984</u>?  Do you
remember testifying then, don't you, Mr. Lee?

A        At the time I was scared.

Q        You were scared of what?

A        I was scared of what Gerrard and Gilbert might do.

28a

Lee - direct                                          4.20

Q       What ~~changes~~ your mind now?  Why suddenly this morning,

after I talked to you and you didn't tell me anything of this,

why suddenly when  Willie Stokes is brought into the courtroom,

right now, do you suddenly change your mind?

                Aren't you still afraid?

A       I am still afraid?

Q       In other words you said on May 30, 1984 you went to

Courtroom 675, before Judge Kaffrison, and you were called as a

witness; were you not?

A       That's right.

Q       And you remember the court crier calling you up and

putting the Bible under your hand, and you swore to tell the

whole truth, nothing but the truth, so help you God?

                You remember that, don't you, Mr. Lee?

A       I was nervous at the time.

Q       'Let me ask my question, then you can answer and explain.

Do you remember when he put the Bible under your hand and you

swore to tell the truth?

A       Yes, I remember.

Q       You remember it?

A       Yes.

Q       And you remember testifying as follows?

Lee - direct                                    4.21

-- MR. DI DONATO:  Directing your Honor's attention
to page 40 of the notes of testimony?  I believe Mr.
Gershenfeld has a copy.  Mr. Gershenfeld was in fact
there.

BY MR. DI DONATO:

Q       This was asked you by another District Attorney, not
myself, at the bottom of the page.

"Question:  I want you to go on in your own words
and tell the Court what was said between you and this
defendant regarding the shooting of Leslie Campbell
at that time?

"Answer:  Well, we was in my basement drinking
beer, smoking marijuana, getting high.  We was talking
about that the guy that they had caught for killing
Reggie Hunter and everybody was saying no, they don't
think he got caught.  Willie Stokes just got to bragging
telling us how he killed Leslie Campbell.

"Question:  When you say he was bragging about
it, as near as you can recall, sir, what did this
defendant say at that time?

"(Your answer:)  Well, he was saying that every-
body don't get caught, you know, when they kill somebody.

30a

Lee - direct                    4.22

So, he went on to say that he was gambling, gambling for about two days.

"Question:  Right.

"Answer:  And he said the first day they were gambling at 30th and Stiles and Campbell beat him out of a large sum of money.

"Question:  Right.

"Answer:  Then he said the next day they was gambling at 30th and Girard and Campbell and a few other guys, Campbell had broke him, beat him again. He had asked Campbell could he borrow some money to get back in the game. Campbell said he didn't have it. So, Willie told us that he told him, 'Don't be there,' when he comes back. He said he left and came back with some guy named Steven, and Campbell was gambling, and he said, 'What you going to do?' He said Campbell got out, swung at him. Willie Stokes said he fired on him.

"Question:  Now, when the defendant said he fired, did he say how many shots he fired?

"Answer:  He said he just fired on him, you know, emptied the gun.

"Question:  He said he emptied the gun?

31a

Lee - direct                                    4.23

--"Answer:  Yeah."

Do you remember telling that to Judge Kaffrisen when you swore to tell the truth?

A        That's what I said.

Q        Then you lied then; is that what you are telling this jury?

A        That's right.

Q        Okay.  Why didn't you tell that judge the same thing you are telling these people?  Weren't you scared then?

A        I thought they was going to say something if I didn't tell, like I said before, because of Judge Sabo.

Q        Once again, Mr. Lee, don't you know that's what I am going to do right now?  Don't you know, Mr. Lee, as far as we are concerned now this agreement is null and void?  It doesn't mean anything now.  (Mr. DiDonato tore Commonwealth Exhibit C-4.)

Aren't you still afriad of that?

A        You are going to do what you all going to do anyway.

Q-       After May 30, 1984 you appeared in court with your attorney, Arthur Dixon, on June 8, 1984, and you signed the following agreement.  I will read it to you.

MR. GERSHENFELD:  I object.

Lee - direct                                    4.24

-- THE COURT:  What is the ground of the objection?

MR. GERSHENFELD:  May I see you in chambers?

THE COURT:  All right, come back.

———

(The following in chambers:)

MR. DI DONATO:  Obviously, Judge, I have been sitting here for an hour and he never mentioned one word of this.

MR. GERSHENFELD:  For the record, your Honor, he already has brought out there is an agreement, there was an agreement, that he has violated this agreement.

To bring out this agreement, to let him read in here about what he agreed to testify about, three or four other murders, I feel is highly prejudicial to my client.

MR. DI DONATO:  Judge, the other murders that are mentioned in this agreement have nothing to do with this defendant.

MR. GERSHENFELD:  That is exactly what I mean.

MR. DI DONATO:  Can I finish what I am trying to get at?  I am attacking this witness's credibility. He has said that he has testified in the past and given

33a

Lee - direct                                    4.25

statements in the past, and now suddenly he is changing
his story.

He was always afraid in the past to tell the
truth because he was afraid the detectives would go to
Judge Sabo.  Now, that is exactly what is going to
happen.

What I want to know is what has changed his mind
between June 8th, when he sign this agreement, and now.
Why suddenly has he changed his mind?

MR. GERSHENFELD:  There is a complete conflict.
His statement is in complete conflict with all the other
testimony that we have had here before this.

THE COURT:  Obviously that doesn't foreclose
the Commonwealth.  He did make a statement.  He says he
made a statement.  He said that he copied the statement
that this other fellow gave, Singleton, whatever his
name was.

MR. GERSHENFELD:  Right.

THE COURT:  He did admit signing it.  As such I
think the jury is entitled to conclude from that that
he made this statement.

The only question then is was it done voluntarily

Lee - direct                              4.26

and he says it wasn't, but he hasn't shown at this

point, anyhow, any indication that he was beaten or

anything of that nature.

The only thing that has come out, to my know-

ledge, is the fact that certain deals were made with

him, and the deals that were made with him are set forth

in the agreement between the Commonwealth and this

witness and Arthur Dixon, his lawyer.

No, I think the Commonwealth has the right to

show this to show that the statement that he did make

to the police was accurate, was correct.

MR. GERSHENFELD:  Your Honor, if your Honor

please, I have not yet objected to the statement, his

statement being admitted.  I am not going to argue about

that part of it, but I am arguing, sir, about the

agreement being part of it.

I am arguing about questions as to what does

this have to do with impeaching his witness?

THE COURT:  Because he --

MR. GERSHENFELD:  He has gotten in there that

he made an agreement, period.  He got in there that --

THE COURT:  I think the jury wants to know what

Lee - direct                                          4.27

the agreement was.  I think they have the right to know.
I think it bears on credibility.

MR. GERSHENFELD:  I believe, your  Honor, it is
prejudicial.  If your Honor wants to put it in --

THE COURT:  Lots of things are prejudicial but
not necessarily --

MR. GERSHENFELD:  I believe it is error, your
Honor, definitely, to bring in any other deal that was
made with regard to this statement, other than as to
this case.

THE COURT:  I don't think so.  If I am wrong
you will have appropriate rights.

MR. GERSHENFELD:  Fine.

MR. DI DONATO:  Thank you, your Honor.

(Discussion in chambers concluded.)

———

MR. DI DONATO:  With the Court's permission,
your Honor?

THE COURT:  Please.

MR. DI DONATO:  Thank you.

BY MR. DI  DONATO:

36a

Lee - direct                                                    4.28

Q       Mr. Lee, let me just backtrack a little bit.  On May
30th you came before Judge Kaffrisen and you testified in
Courtroom 675 and you told Judge Kaffrisen basically the same
thing you said in your statement that you signed.

        Is that correct?

A       Yes.

Q       And you are now telling the jury the reason you said
all that is it was a lie, and you said it because you were
afraid that the police were going to go in front of Judge Sabo
on your murder case and recommend a harsh sentence.

        Is that correct?

A       Yes.

Q       That's what you were afraid of; right?

A       Yes.

Q       On June 8, 1984 you appeared before that exact same
judge, Judge Sabo, the District Attorney was Tom Bello, and
your attorney was Arthur Dixon.

        Is that correct?

A       That's right.

Q       And you recall signing both pages of this agreement?
Is there any doubt in your mind about that?

A       That's what I signed.

Lee - direct                                          4.29

Q        And your lawyer signed it right below you?  He was right there guiding you through the whole procedure?

A        (Indicating affirmatively.)

Q        You have to say yes.

A        Yes.

Q        You had consulted with your lawyer before you signed the agreement; correct?

A        Yes.

Q        You had discussed with him what was best for you; is that correct?

A        No, they was already in it.  The lawyer didn't know nothing about the deal until after he talked to Gerrard and Gilbert.

Q        In other words they worked it all out with you?  Nobody ever talked to your lawyer?

A        No, they talked to him in court.

Q        I see.  Do you remember this?

                "Defendant agrees as follows:

                Number 1, to testify at all proceedings in Commonwealth versus Willie Stokes consistent with his statement to the police and his testimony at the preliminary hearing for Stokes for murder of Leslie

Lee - direct                                    4.30

Campbell."

> Do you recall that?

A     Yes, I said that.

Q     You agreed to do that.

> "Number 2, to testify at all proceedings in
Commonwealth versus Archie Scott consistent with his
statement to police given on January 19, 1984 (the same
day) for the murder and robbery of Lorenzo Walker, to
which he was a co-conspirator."

> Did you agree to do that?

A     Yes, that's the one I was only supposed to agree to do
anyway.

Q     So as I understand it, I want the jury to be clear, on
January 19, 1984 you signed two separate statements?  In one of
them you said Archie Scott committed the murder that you were
involved in?

A     That's right.

Q     You are still saying that's true when you signed that
one?  That was all true; correct?

A     It is true.

Q     This statement that I just read to the jury, that wasn't
true?

Lee - direct                                    4.31

A       No, sir, it wasn't.

Q               "Number 3.   (You agreed to) testify at any
        future proceedings in relation to the murder of Julie
        Revsin which occurred on March 21, 1980 . . "
                So that was a whole 'nother case that you
agreed to cooperate on?  You had all this knowledge; is that
correct?

A       That wasn't never no case.

Q       Because we couldn't find the guy that did it?  He hasn't
been caught yet; is that correct?

A       Yes.

Q       But you gave a statement telling the police about it?

A       No, they had gave it to somebody else.  I gave a state-
ment telling the police that it wasn't true.

Q       Well, it says here that you agreed to testify in that
case when an arrest was made?

A       Yes.

Q       You didn't agree to do that?

A       Yes, but they have another copy saying that I signed
the affidavit saying it wasn't true.

Q       I see.  You have another copy?  Do you know where this
copy is, by any chance?

Lee - direct                                    4.32

A       No, they got it.

Q       Who is "they"; the police?

A       Right, the police have it.

Q       How about your attorney? He wouldn't happen to have
one, would he?

A       No.

Q       Then comes the part that you were going to get in
return for all this cooperation. It says:

                "The Commonwealth agrees as follows:

                "Number 1, to allow Franklin Lee to plead guilty
        to the charges of murder in the third degree for his
        part in the December 21, 1982 murder-robbery of Lorenzo
        Walker."

                Is that correct?

A       Yes, after the statement I was -- when they charged me
I was supposed to plead guilty anyway. That's what they wanted
me to plead guilty to it.

Q       You didn't plead guilty for a year and a half? You
were arrested in January of 1983, and you didn't plead guilty
until June of 1984.

                Isn't that correct, Mr. Lee?

A       That's right.

Lee - direct                                    4.33

Q       So when you say you wanted to plead guilty when the
police arrested you back in 1983 you didn't walk in and say,
"I want to plead guilty," did you?

A       That's right, I didn't.

Q       On your murder case we agreed to drop the robbery charge
and the conspiracy charge, we agreed not to prosecute you for
first or second degree murder, we let you plead guilty to
third degree murder?

        That was part of the deal, was it not?

A       Yes, that's what they said.

Q       Then it also says that:

        "His sentence will run concurrent to any sen-
        tence he will receive from probation or parole violation
        or from Judge Marvin Halbert arising out of a conviction
        for which sentence is still open."

        Do you remember that?

A       That's right.

Q       So that the jury understands that, that means you had
another rape case plus some parole violations outstanding;
correct?

A       No probation.

Q       You still have the rape case in front of Judge Halbert

Lee - direct                                    4.34

too, don't you?

A       Right.

Q       You haven't been sentenced on that rape case, have you?

A       That's right.

Q       Part of the deal was any time that you would receive for the murder, you would do that time at the same time as the rape case; isn't that correct?

        You were sort of getting two for the price of one; right?

A       Well, that's what they had made, what Gerrard and Gilbert said they was going to do.

Q       Your attorney was here now?  You had an attorney in the room, just like he is sitting here for Mr. Stokes?  You had your attorney there, wasn't he, adding anything to all this, Mr. Lee?

A       He never knew about it until we went for it in court.

Q       He was there then when this was signed, was he not?

A       Yes, he was.

Q       So he knew about all this?

A       Then.

Q       Then?

A       When they showed it to him.

Lee - direct                                    4.35

Q        The other thing:

       "Judge Halbert at the time of the sentencing
for the open charges in front of him will be made aware
of Mr. Lee's cooperation in the three homicide cases
mentioned above.  The Commonwealth will make no recom-
mendation as to what sentence Judge Halbert should give,
leaving sentencing to the sole discretion of the Judge.

       "Franklin Lee when sentenced on the charges
before Judge Sabo and Judge Halbert will not be housed
in Graterford State Correctional Institution or any
correctional institution where any person he may
testify against is housed.

       "Any judge whose probation and/or parole Mr.
Lee is on will be made aware of his cooperation.  How-
ever, the Commonwealth will make no recommendation
with any sentence, that sentence being solely in the
judge's discretion."

       Correct?  This is all of what you were going to
get in return for testifying; is that right?

A        Yes, that's what they said.

Q        All right.  Now, the thing that I am a little confused
about is all along you say that you were lying to the police,

44a

Lee - direct                                    4.36

in their statement, and you lied to the judge because you were
afraid of what was going to happen in front of Judge Sabo on
your murder case; is that correct?

A       I told you they let me read Anthony Singleton's state-
ment when I made it.

Q       Let me repeat the question in case you were a little
bit confused; all right?  All along you lied to the police, and
you lied to Judge Kaffrisen, because you didn't want the police
or the D.A.'s office to go in front of Judge Sabo on your
murder case and say, "Judge, we want you to hammer this guy,
we want you to give him the maximum sentence that is allowed by
the law."

        That's what you were afraid of; is that correct?

A       No, I wasn't afraid of that.  I just went along with
Anthony Singleton's statement.

Q       Why?  Tell them why?

A       Because he went down there and made a deal.

Q       Who made a deal?

A       Anthony Singleton.

Q       What has that got to do with you?

A       What has that got to do with me?

Q       Yes.

Lee - direct                                    4.37

A       They let me see his -- read his statement.

Q       I know.  You told us that.

A       That's how I made that statement.

Q       You told us that.  In other words just because Anthony Singleton made a statement you would lie about what you say is an innocent man?

A       That's right, I went along with it.

Q       Why?  What were you getting in return?  The deal; right?

A       That's what they said, no deal at the time.  They said they would do something for me.

Q       That's right.  When I asked you about the preliminary hearing I said to you, "Mr. Lee, why did you lie to the judge?"

                And you said, just a couple minutes ago, "Because I was afraid the detectives would  go before Judge Sabo and say something to him."

                Didn't you tell us that?

A       That's what I said.

Q       So you were afraid at that time, and that's why you lied; is that correct?

A       Right.

Q       What has changed your mind between June 8th, when you signed this, and now?  Why have you suddenly decided to risk

46a

Lee - direct                                    4.38

all that?           --- -

A        Because it is not true.

Q        Why did you change your mind only now?  Why didn't you
change your mind before?

           MR. GERSHENFELD:  I object, your Honor.  He has
        answered the question the best he can.

           MR. DI DONATO:  Maybe I  missed the answer.

           THE COURT:  I will overrule the objection.

BY MR. DI DONATO:

Q        I want you  to tell the jury why now you  have decided
to change your mind?  Did anybody threaten to kill you or your
family?

A        It is not true, that's what I am saying.  The statement
ain't true.

Q        Why didn't you say that before?  Why didn't you ever
tell your attorney it wasn't true?  Why didn't you tell Judge
Kaffrisen it wasn't true?

A        My attorney never asked me.

Q        Judge Kaffrisen asked you?  You were under oath.  You
put your hand on the Bible, just like you did today.  I guess
that doesn't mean too much to you, does it, Mr. Lee?

A        I am telling you they was going to do something.  They

47a

Lee - direct

4.39

had me under pressure.  I did what I thought was best.

Q        Don't we still have you under pressure now?  Don't we still have you under pressure?  Isn't it the same pressure?  You know right now we are going to go back before Judge Sabo and say, "Judge, he reneged on his deal with us.  He admitted to lying on the stand and he should get the maximum for your rape and your murder."

Now that's going to happen.  Don't you know that?

A        (No response.)

Q        What has got you so terrified that you are willing to do that?

MR. GERSHENFELD:  I object, your Honor.

THE COURT:  I think we better -- he has answered to the point where the jury gets to understand.

BY MR. DI DONATO:

Q        Have you had any contact with Mr. Stokes between June 8th and today?

A        Have I had any  contact with him?

Q        Yes.

A        No.

Q        You have never spoken to him on the phone, never saw

48a

Lee - direct                                    4.40

him in person?

A        I seen him in person.  I met him right downstairs when they bring him up.

Q        You have talked to him?

A        No, I haven't talked to him.

Q        When you saw him did you ever mention this case?  He knew you were going to be a witness against him, didn't he?

A        Yes, he knew, I guess so.  The lawyer knew.

Q        You never said anything to him, and he never said anything to you; is that correct?

A        Right.

Q        When you walked into this courtroom this morning at 9:30 before the jury was in the room, and before Willie Stokes was in this room, why didn't you tell me what you just told this jury?  Why did you wait until you got on the stand?

            MR. GERSHENFELD:  I object, your Honor.

            THE COURT:  I think we have been over that.

            MR. DI DONATO:  I have no further questions, Judge.

            MR. GERSHENFELD:  May I see the statement which was entered into the record?

            Just one or two questions, if I might.

Lee - cross

4.41

CROSS EXAMINATION

BY MR. GERSHENFELD:

Q        Mr. Lee, you stated in your statement that was signed
by you on January 19, 1984, about the crap game that Willie
said he left and came back with some guy named Steven.

       "Gregory was still gambling and Willie asked
      him what he was going to do, and Gregory folded his
      money up and put it in his pocket and they started
      arguing.  Gregory took a swing at him and missed, and
      Willie emptied his gun on him."

      Is that what Willie told you?

A        No.

Q        Did Willie tell you anything about this matter?

A        No.

Q        You mentioned, I don't know whether you  mentioned it
in your statement or whether you mentioned it in testimony,
you mentioned that certain people were at your house drinking.
I think there was Gregory, yourself, Willie Stokes and Anthony
Singleton.  Was Willie Stokes ever in your house with you,
Anthony and Gregory?

A        No.

      MR. GERSHENFELD:  No further questions.

Lee - cross

-- MR. DI DONATO:  No further questions.

THE COURT:  All right, are both sides through?

MR. GERSHENFELD:  Yes.

THE COURT:  All right, you are excused.

(Witness excused.)

———

MR. GERSHENFELD:  May we have a recess for a second, your Honor?

THE COURT:  Yes.  Do you want to speak to me?

MR. GERSHENFELD:  No.

THE COURT:  All right.

MR. GERSHENFELD:  No objection.  Go ahead, call the next witness.  No objection.

MR. DI DONATO:  Judge, I would ask for a five minute recess, please.

THE COURT:  At the request of counsel we will have a five minute recess.

(Short recess.)

MR. DI DONATO:  May I proceed, Judge?

THE COURT:  Please.

MR. DI DONATO:  Thank you, your Honor.

# EXHIBIT

# D

### Affidavit of Truth Attached Writing

State of Pennsylvania

County of Lycoming

The undersigned Gerald Sanders, being duly sworn hereby deposes and says:

I am over the age of 18 and resident of state of Pennsylvania. I have the personal knowledge of the facts herein, and if called as a witness could testify completely.

I suffer no legal disabilities and have personal knowledge of the facts set forth below.

I declare that, to the best of my knowledge and belief the information herein is true, correct and complete.

### RE: <u>Attachment of Statement of Facts for Letter from Franklin Lee</u>

To whom this concerns,

I Gerald Sanders AKA "Satch" received letter referenced Exhibit 'A' from SCI Graterford inmate (AY-3924) Franklin Lee on or around September 3rd, 2015. He wrote and sent letter to me in response to my previous correspondence and request for him to disclose to me the name of woman allowed by Philadelphia Police Detectives Ernest Gilbert and Lawrence Gerrard to visit him in 1983-84 at Philadelphia Police Administration Building (PAB) while he was in custody at Holmesburg Prison. Mr. Lee and Ms. Charmaine Paschall were allowed to engage in sexual intercourse during visits as "special favors" in exchange for his cooperation in prosecution of Mr. Willie Stokes.

Mr. Lee, in fact, was told by Detectives Gilbert and Gerrard to make up a false, fabricated statements against Stokes. He mentions it in referenced letter (See exhibit A). The false statements were, in fact, used subsequently to establish probable cause to obtain arrest warrant and for prima facie to hold case for trial at preliminary hearing May 30th, 1984. Mr. Lee did not sign referenced letter (exhibit A) however he reveals authorship by referring to specific details in his cases for example **"it's time for Ant to testified"** referring to his codefendant Anthony Singleton who conspired with him to make false statements against Stokes. Also he refers to his recanted testimony at Stokes trial **"I already told the truth at Willie Trial."** He further states **"I testified on how the police told me what to say"** admitting police told him to make up fabricated details in statement. Again he states too **"all I got is another 3 1/2 to 7 years"** sentenced received for conviction for perjury against Stokes.

The significance of disclosing Ms. Charmaine Paschall is her name is signed in PAB Lobby Visitors Log Book as required each time she visited Mr. Lee at PAB IN 1983-84. Her signature serves to corroborate other evidence where aforementioned Philadelphia Police Detectives Ernest Gilbert and Lawrence Gerrard allowed same special visiting favors to other Holmesburg prison inmates cooperating in 1983-84 in other cases. We have evidence detectives allowed Maxine Harris, Sharon Artis and three other women related to inmate Arthur Lester to visit Charles Atwell, Anthony Singleton and Arthur Lester respectively at PAB IN 1983-84 while they were cooperating providing false statements in other unrelated cases. The visits served to coerce Lee, Atwell, Singleton and Lester. The visits at "police facilities by adults to prisoners in police custody" were a direct violation of Philadelphia Police Policy Directive 82. Detectives ignored policy coercing Lee with special visitation favors.

I herein submit this document addressed to me from (See attached copy of envelope) Gerald Sanders at my aka Satch from Franklin Lee for evidence along with affidavit for Mr. Willie Stokes. This document is to be introduced as evidence in any appeal, P.C.R.A., etc.

Gerald Sanders

*Gerald Sanders*

Executed this ____ day of ____ Sept, 20____

Notary Acknowledgement

State of ____ PA ____, County of ____ Lycoming ____, SS:

Notary Public
COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MICHAEL S KUTNEY
Notary Public
WILLIAMSPORT, LYCOMING COUNTY
My Commission Expires Dec 3, 2016

My Commission Expires

Satch

What's up, that's good News, that you have been intouch with ant, and he's helping willie, Listen, as for me, I already told the truth at willie trial, I testified on how the Police Told me what To say, anyway it's all in willie Notes, And All I got was another 3½ to 7 years, so I'm Not doing, No more testifing NOR AM I contacting any Lawyers, it's time for Ant to testified, anyway here is the Girl Name, Charmaine Paschall, the Last KNOWN address she live at was 3328 N 5ths Phila, Pa, 19132, Now this was back in 1983 however, I hope that helps willie, because you or None of the so call homies, didn't say one thing when Archie Scott, gave me and ant that Body. that we had to plea guilty to for 10 to 20, year, in Another 25 to 50 yrs. for the Rapes, Listen, satch that's it I got my own shit I'm dealing with.

EXHIBIT 'A'

# EXHIBIT

# E

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 1 of 11

## CASE INFORMATION

Cross Court Docket Nos:  106 EM 2011, 95 EM 2012, 150 EM 2012, 23 EM 2013, 1335 EDA 2014, 20 EAL 2019, 3437 EDA 2017

| | |
|---|---|
| Judge Assigned:  Carpenter, Linda | Date Filed:  06/06/1984       Initiation Date:  06/06/1984 |
| OTN:  M 183651-6              LOTN: | Originating Docket No:  08403246011 |
| Initial Issuing Authority: | Final Issuing Authority: |
| Arresting Agency:  Philadelphia Pd | Arresting Officer:  Affiant |
| Complaint/Citation No.: | Incident Number: |
| Case Local Number Type(s) | Case Local Number(s) |
| District Control Number | 8023050687 |
| PSI Microfilm Number | 850180 |
| Police Incident Number | 8023050687 |
| Legacy Microfilm Number | 97013897 |
| Legacy Docket Number | C8406066611 |

## STATUS INFORMATION

| Case Status: | Closed | | | Arrest Date: | 03/29/1984 |
|---|---|---|---|---|---|
| | | Status Date | Processing Status | | |
| | | 07/08/2019 | Appeal Decided | | |
| | | 01/22/2019 | Awaiting Appellate Court Decision | | |
| | | 10/24/2018 | Appeal Decided | | |
| | | 10/03/2017 | Awaiting Appellate Court Decision | | |
| | | 09/29/2017 | Completed | | |
| | | 11/09/2015 | Awaiting PCRA Decision | | |
| | | 02/06/2015 | Appeal Decided | | |
| | | 04/28/2014 | Awaiting Appellate Court Decision | | |
| | | 01/16/2014 | Awaiting PCRA Decision | | |
| | | 11/15/2013 | Completed | | |
| | | 11/08/2013 | Awaiting PCRA Decision | | |
| | | 09/19/2013 | Completed | | |
| | | 03/04/2013 | Awaiting PCRA Decision | | |
| | | 07/07/2009 | Completed | | |
| | | 12/18/2007 | Awaiting Appellate Court Decision | | |
| | | 11/29/2007 | Awaiting Post Conviction Relief Act Hearing | | |
| | | 01/20/2006 | Awaiting Appellate Court Decision | | |
| | | 12/12/2005 | Completed | | |
| | | 04/10/1985 | Migrated Final Disposition | | |
| | | 06/06/1984 | Migrated Case (Active) | | |

Complaint Date:      06/06/1984

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 2 of 11

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Post Conviction Relief Act | 10/05/2005 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 11/04/2005 | 8:30 am | 206 | | Scheduled |
| Post Conviction Relief Act | 11/09/2005 | 8:30 am | 502 | Judge Willis W. Berry Jr. | Scheduled |
| Post Conviction Relief Act | 12/12/2005 | 8:30 am | 502 | Judge Willis W. Berry Jr. | Scheduled |
| Post Conviction Relief Act | 12/10/2007 | 9:00 am | 502 | Judge Willis W. Berry Jr. | Scheduled |
| PCRA | 05/16/2013 | 9:00 am | 206 | | Moved |
| PCRA | 09/16/2013 | 9:00 am | 808 | Judge Linda Carpenter | Continued |
| PCRA | 11/15/2013 | 9:00 am | 808 | Judge Linda Carpenter | Scheduled |
| PCRA | 08/02/2016 | 9:00 am | 206 | | Moved |
| PCRA | 08/26/2016 | 9:00 am | 604 | Judge Linda Carpenter | Continued |
| PCRA | 10/07/2016 | 9:00 am | 1108 | Judge Linda Carpenter | Continued |
| PCRA | 11/18/2016 | 9:00 am | 701 | Judge Linda Carpenter | Continued |
| PCRA | 01/13/2017 | 9:00 am | 1105 | Judge Linda Carpenter | Continued |
| PCRA | 03/10/2017 | 9:00 am | 702 | Judge Linda Carpenter | Scheduled |
| PCRA | 05/05/2017 | 9:00 am | 701 | Judge Linda Carpenter | Scheduled |
| PCRA | 06/30/2017 | 9:00 am | 1002 | Judge Linda Carpenter | Continued |
| PCRA | 08/04/2017 | 9:00 am | 708 | Judge Linda Carpenter | Continued |
| PCRA | 09/29/2017 | 9:00 am | 907 | Judge Linda Carpenter | Scheduled |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|
| 02/23/1989 | State Correctional Institution | SCI Chester | | Yes |

## DEFENDANT INFORMATION

| Date Of Birth: | 07/21/1960 | City/State/Zip: PHILA., PA 19100 |
|---|---|---|

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Stokes, Willie |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 2502 | MURDER-1ST DEGREE | 10/01/1980 | M 183651-6 |

CPCMS 9082

Printed: 08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 3 of 11

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 2 | 2 | | **18 § 2503** | VOLUNTARY MANSLAUGHTER | 10/01/1980 | M 183651-6 |
| 4 | 4 | | **18 § 908.1** | PROHIBITED OFFENSIVE WEAPONS | 10/01/1980 | M 183651-6 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|------------|------------------|-------------------|
| Sequence/Description | Offense Disposition | Grade    Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

Migrated Disposition

| Migrated Dispositional Event | 04/10/1985 | Final Disposition |
|------------------------------|------------|-------------------|
| 1 / MURDER-1ST DEGREE | Guilty | 18 § 2502 |
| Malmed, Edwin | 04/10/1985 | |
| Confinement | Life | |
| 2 / VOLUNTARY MANSLAUGHTER | Guilty | 18 § 2503 |
| Malmed, Edwin | 04/10/1985 | |
| Confinement | Life | |
| 4 / PROHIBITED OFFENSIVE WEAPONS | Guilty | 18 § 908.1 |
| Malmed, Edwin | 04/10/1985 | |
| Confinement | | |

| COMMONWEALTH INFORMATION | | ATTORNEY INFORMATION | |
|--------------------------|--|----------------------|--|
| Name: | Philadelphia County District Attorney's Office | Name: | Michael Jay Diamondstein |
| | Prosecutor | | Private |
| Supreme Court No: | | Supreme Court No: | 078973 |
| Phone Number(s): | | Rep. Status: | Active |
| 215-686-8000 | (Phone) | Phone Number(s): | |
| Address: | | 215-940-2700 | (Phone) |
| 3 South Penn Square | | Address: | |
| Philadelphia, PA  19107 | | Michael J Diamondstein Pc | |
| | | 1500 Jfk Blvd Ste 900 | |
| | | Philadelphia, PA  19102-1532 | |
| | | Representing: Stokes, Willie | |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|-----------------|---------------|---------------|----------|
| 1 | 06/06/1984 | | Unknown Filer |
| Held for Court | | | |

CPCMS 9082

Printed:  08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 4 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 04/10/1985 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 04/10/1985 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 04/10/1985 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 07/28/2005 | | Migrated, Filer |
| PCRA CASE ENTRY  SUFFIX D | | | |
| 1 | 08/23/2005 | | Migrated, Filer |
| CRIMINAL DOCKET COMMENTS | | | |
| 1 | 08/30/2005 | | Migrated, Filer |
| PCRA FILE MAINT.  SUFFIX D | | | |
| 2 | 08/30/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX D | | | |
| 2 | 10/05/2005 | | Migrated, Filer |
| PCRA FILE MAINT.  SUFFIX D | | | |
| 2 | 11/09/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX D | | | |
| 1 | 11/17/2005 | | Migrated, Filer |
| PCRA FILE MAINT.  SUFFIX D | | | |
| 1 | 12/08/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX D | | | |
| 2 | 12/12/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX D | | | |
| 1 | 12/13/2005 | | Migrated, Filer |
| PCRA FILE MAINT.  SUFFIX D | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



Docket Number: CP-51-CR-0606661-1984

# CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 5 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 01/20/2006 | | Unknown Filer |
| Notice of Appeal to the Superior Court | | | |
| D32/D33/1 | 01/24/2006 | | Migrated, Filer |
| APPEAL CASE FILED  SUFFIX D | | | |
| 1 | 02/14/2006 | | Migrated, Filer |
| APPL FILE MAINT  SUFFIX D | | | |
| D34/1 | 02/16/2006 | | Migrated, Filer |
| COURT APPOINTMENTS | | | |
| 1 | 04/04/2006 | | Migrated, Filer |
| APPL FILE MAINT  SUFFIX D | | | |
| D35A/1 | 06/29/2006 | | Berry, Willis W. Jr. |
| Proof of Service | | | |
| D35/1 | 07/05/2006 | | Migrated, Filer |
| APPL FILE MAINT  SUFFIX D | | | |
| D36/1 | 06/06/2007 | | Berry, Willis W. Jr. |
| Opinion | | | |
| 2 | 06/06/2007 | | Court of Common Pleas - Philadelphia County |
| Appeal Docket Entries and Served | | | |
| 3 | 06/06/2007 | | Court of Common Pleas - Philadelphia County |
| Certificate and Transmittal of Record to Appellate Court | | | |
| 1 | 11/30/2007 | 11/21/2007 | Superior Court of Pennsylvania - Eastern District |
| Remand for Attorney Compliance Hearing | | | |
| 1 | 12/10/2007 | | Berry, Willis W. Jr. |
| The court finds that Defense counsel B. McDermott did not abandon her client. | | | |

Printed:  08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 6 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 01/29/2008 | | |
| Appointment Notice | | | |
| 1 | 10/30/2008 | | Superior Court of Pennsylvania - Eastern District |
| Appeal of Denial of PCRA Affirmed | | | |
| 1 | 01/16/2009 | | Supreme Court of Pennsylvania - Eastern District |
| Petition for Allowance of Appeal Filed - Supreme Court | | | |
| 1 | 06/01/2009 | | Supreme Court of Pennsylvania - Eastern District |
| Petition for Allowance of Appeal Denied - Supreme Court | | | |
| D37/1 | 11/17/2010 | | Stokes, Willie |
| Petition for Writ of Habeas Corpus | | | |
| D38/1 | 08/08/2011 | | Stokes, Willie |
| Pro Se Correspondence | | | |
| D39/1 | 01/25/2012 | | Supreme Court of Pennsylvania - Eastern District |
| Writ of Mandamus and/or Extraordinary Relief Requests Mandamus Relief, it is Granted | | | |
| D40/1 | 03/12/2012 | | Stokes, Willie |
| Amended Petition for Writ of Habeas Corpus | | | |
| 1 | 02/20/2013 | | Smarro, Janis |
| Entry of Appearance | | | |
| D41/1 | 07/22/2013 | | Smarro, Janis |
| PCRA - Finley Letter Filed | | | |
| D42/2 | 07/22/2013 | | Smarro, Janis |
| Motion to Withdraw as Counsel | | | |
| 3 | 09/16/2013 | | Carpenter, Linda |
| Order Granting Motion for Continuance | | | |

Printed: 08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 7 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| D43/1 | 09/17/2013 | | Carpenter, Linda |
| PCRA - Dismissal Notice Under Rule 907 Filed | | | |
| D44/1 | 09/19/2013 | | New, Arnold L. |
| Transferred to Criminal Division | | | |
| D45/2 | 09/19/2013 | | Stokes, Willie |
| Petition for Writ of Habeas Corpus | | | |
| D46/3 | 09/19/2013 | | Stokes, Willie |
| Motion to Proceed In Forma Pauperis | | | |
| D47/1 | 09/27/2013 | | Stokes, Willie |
| Response to PCRA - Dismissal Notice - Rule 907 Filed | | | |
| D48/1 | 11/15/2013 | | Smarro, Janis |
| Defense Letter Brief | | | |
| D49/2 | 11/15/2013 | | Carpenter, Linda |
| Order Dismissing PCRA Petition | | | |
| D50/1 | 01/16/2014 | | Stokes, Willie |
| Post-Conviction Relief Act Petition Filed | | | |
| D51/1 | 04/07/2014 | | Stokes, Willie |
| PCRA - Amended PCRA Petition Filed | | | |
| D52/1 | 04/14/2014 | | Stokes, Willie |
| Motion to Reconsider | | | |
| D53/1 | 04/17/2014 | | Carpenter, Linda |
| Order Granting Reinstatement of Appellate Rights Nunc Pro Tunc to Superior Court | | | |

Philadelphia County District Attorney's
Office
04/17/2014    First Class
Stokes, Willie
04/17/2014    First Class

| D54/1 | 04/28/2014 | | Stokes, Willie |
|---|---|---|---|
| Notice of Appeal to the Superior Court | | | |

CPCMS 9082

Printed: 08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 8 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| D55/1 | 04/30/2014 | | Stokes, Willie |
| In Forma Pauperis Statement | | | |
| 2 | 04/30/2014 | | Court of Common Pleas - Philadelphia County |
| Preliminary Docket Entries Prepared | | | |
| D56/1 | 06/18/2014 | | Carpenter, Linda |
| Opinion | | | |
| 2 | 06/18/2014 | | Court of Common Pleas - Philadelphia County |
| Appeal Docket Entries and Served | | | |
| 3 | 06/18/2014 | | Court of Common Pleas - Philadelphia County |
| Certificate and Transmittal of Record to Appellate Court | | | |
| 1 | 07/25/2014 | | Stokes, Willie |
| Pro Se Correspondence | | | |
| 1 | 07/31/2014 | | Court of Common Pleas - Philadelphia County |
| Transcript from Lower Court | | | |
| 2 | 07/31/2014 | | Court of Common Pleas - Philadelphia County |
| Certificate and Transmittal of Notes of Testimony to Appellate Court | | | |
| 1 | 09/17/2014 | | Stokes, Willie |
| Amended Petition for Writ of Habeas Corpus Filed | | | |
| 1 | 09/26/2014 | | Stokes, Willie |
| Inmate Document Request | | | |
| 1 | 02/06/2015 | | Superior Court of Pennsylvania - Eastern District |
| Appeal of Denial of PCRA Affirmed | | | |

CPCMS 9082

Printed: 08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 9 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 02/06/2015 | | Superior Court of Pennsylvania - Eastern District |
| Superior Court Opinion | | | |
| 1 | 03/24/2015 | | Court of Common Pleas - Philadelphia County |
| Record Returned Date to Appeal Unit | | | |
| 1 | 11/09/2015 | | Diamondstein, Michael Jay |
| Post-Conviction Relief Act Petition Filed | | | |
| 1 | 11/30/2015 | | Diamondstein, Michael Jay |
| Supplement PCRA Amended PCRA Petition Filed | | | |
| 4 | 08/26/2016 | | Carpenter, Linda |
| PCRA Hearing Continued | | | |
| 1 | 10/05/2016 | | Philadelphia County District Attorney's Office |
| Motion to Dismiss | | | |
| 4 | 10/07/2016 | | Carpenter, Linda |
| Order Granting Motion for Continuance | | | |
| 1 | 10/26/2016 | | Javie, Jason David |
| Answer/Response | | | |
| 1 | 01/13/2017 | | Carpenter, Linda |
| Order Granting Motion for Continuance | | | |
| 1 | 03/10/2017 | | Carpenter, Linda |
| Court Request For Continuance Case Held Under Advisement | | | |
| 1 | 03/30/2017 | | Diamondstein, Michael Jay |
| Letter in Brief | | | |
| 1 | 05/05/2017 | | Carpenter, Linda |
| PCRA Continued for Court's Decision | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 10 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 06/30/2017 | | Carpenter, Linda |
| Order Granting Motion for Continuance | | | |
| 1 | 08/04/2017 | | Carpenter, Linda |
| PCRA - Dismissal Notice Under Rule 907 Filed | | | |
| 2 | 08/04/2017 | | Carpenter, Linda |
| Order Granting Motion for Continuance | | | |
| 1 | 09/29/2017 | | Carpenter, Linda |
| Order Dismissing PCRA Petition | | | |
| 2 | 09/29/2017 | | Carpenter, Linda |
| PCRA Petition Dismissed | | | |
| 1 | 10/03/2017 | | Diamondstein, Michael Jay |
| Notice of Appeal to the Superior Court | | | |
| 1 | 10/05/2017 | | Carpenter, Linda |
| Opinion | | | |
| 1 | 10/26/2017 | | Superior Court of Pennsylvania - Eastern District |
| Docketing Statement from Superior Court | | | |
| 1 | 01/17/2018 | | Court of Common Pleas - Philadelphia County |
| Appeal Docket Entries and Served | | | |
| 2 | 01/17/2018 | | Court of Common Pleas - Philadelphia County |
| Certificate and Transmittal of Record to Appellate Court | | | |
| 1 | 10/24/2018 | | Superior Court of Pennsylvania - Eastern District |
| Superior Court Decision | | | |
| 2 | 10/24/2018 | | Superior Court of Pennsylvania - Eastern District |
| Superior Court Opinion | | | |

Printed:  08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0606661-1984**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Willie Stokes

Page 11 of 11

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 10/24/2018 | | Superior Court of Pennsylvania - Eastern District |
| Appeal of Denial of PCRA Affirmed | | | |
| 1 | 01/22/2019 | | Supreme Court of Pennsylvania - Eastern District |
| Petition for Allowance of Appeal Filed - Supreme Court | | | |
| 1 | 05/28/2019 | | Supreme Court of Pennsylvania - Eastern District |
| Petition for Allowance of Appeal Denied - Supreme Court | | | |

## CASE FINANCIAL INFORMATION

Last Payment Date: 10/04/2017                    Total of Last Payment: -$40.00

| Stokes, Willie Defendant | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Filing Fee (Philadelphia) | $12.50 | ($12.50) | $0.00 | $0.00 | $0.00 |
| Filing Fee (Philadelphia) | $12.50 | ($12.50) | $0.00 | $0.00 | $0.00 |
| Filing Fee (Philadelphia) | $40.00 | ($40.00) | $0.00 | $0.00 | $0.00 |
| Costs/Fees Totals: | $65.00 | ($65.00) | $0.00 | $0.00 | $0.00 |
| Grand Totals: | $65.00 | ($65.00) | $0.00 | $0.00 | $0.00 |

** - Indicates assessment is subrogated

CPCMS 9082

Printed: 08/18/2021

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# EXHIBIT

# F

2.2

=~~   MORNING SESSION

(Jury panel in.)

THE COURT:  Good morning.

MR. DI DONATO:  Good morning, your Honor.

THE COURT:  Arraign the defendant.

THE CRIER:  Mr. Stokes, step to the bar of the court, please.

Willie Stokes, to this bill of information number 666, June Term, 1983, charging you with, first count, murder; second count, voluntary manslaughter.

By this bill of information the District Attorney of Philadelphia County charges, first count, on or about October 1, 1980 in Philadelphia County Willie Stokes did feloniously, wilfully, and of his malice aforethought kill and murder Leslie Campbell; second count, that on the same day and year in Phila-delphia County Willie Stokes did feloniously kill and slay Leslie Campbell, all of which is against the Act of Assembly and the peace and dignity of the Common-wealth of Pennsylvania.

2.3

How say you:  guilty or not guilty?

THE DEFENDANT:  Not guilty.

THE CRIER:  Willie Stokes, to this bill of information number 668, June Term, 1983, charging you with possession of instrument of crime generally, how say you?  Guilty or not guilty?

THE DEFENDANT:  Not guilty.

THE CRIER:  Pleading not guilty, how do you wish to be tried?

THE DEFENDANT:  By God and my country.

THE CRIER:  May God send you a safe delivery. You may be seated.

The defendant pleads not guilty, your Honor.

THE COURT:  Swear the jury.

(Jury sworn at 10:20 a.m.)

THE CRIER:  Jurors, on this bill of information number 666, June Term, 1984, charging Willie Stokes with murder, first count; voluntary manslaughter, second count.

The District Attorney of Philadelphia County by this information charges, the first count, on or about October 1, 1980, in Philadelphia County, Willie

2.4

Stokes did feloniously, willfully, of his malice afore-thought kill and murder Leslie Campbell; second count, on the same day and year in Philadelphia County Willie Stokes did feloniously kill and slay Leslie Campbell, all of which is against the Act of Assembly and the peace and dignity of the Commonwealth of Pennsylvania, to which the defendant pleaded not guilty.

To bill number 668, June Term, 1983, charging Willie Stokes with possession of instruments of crime generally, the defendant pleads not guilty, and has placed himself before God and his country, which country you are.

If you find this defendant you will say so.  If you find this defendant not guilty you will say so, and say no more.

Jurors good and true, stand together and harken to the evidence.  You may be seated.

THE COURT:  Can you all hear me without any difficulty.

(The jurors indicated affirmatively.)

THE COURT:  In the back row?

(The jurors indicated affirmatively.)